FRANCOIS FENELON VIDAL, JOHN F. GIRARD, AND OTHERS, CITIZENS AND SUBJECTS OF THE MONARCHY OF FRANCE, AND HENRY STUMP, COMPLAINANTS AND APPELLANTS, v. THE MAYOR, ALDERMEN, AND CITIZENS OF PHILADELPHIA, THE EXECUTORS OF STEPHEN GIRARD, AND OTHERS, DEFENDANTS.

The corporation of the city of Philadelphia has power, under its charter, to take real and personal estate by deed, and also by devise, inasmuch as the act of 32 and 34 Henry. 8, which excepts corporations from taking by devise, is not in force in Pennsylvania.

Where a corporation has this power, it may also take and hold property in trust in the same manner and to the same extent that a private person may do: if the trust be repugnant to, or inconsistent with, the proper purpose for which the corporation was created, it may not be compellable to execute it, but the trust (if otherwise unexceptionable) will not be void, and a court of equity will appoint a new trustee to enforce and perfect the objects of the trust.

Neither is there any positive objection in point of law, to a corporation taking property upon a trust not strictly within the scope of the direct purposes of its institution, but collateral to them.

Under the general power "for the suppression of vice and immorality, the advancement of the public health and order, and the promotion of trade, industry, and happiness," the corporation may execute any trust germane to those objects.

The charter of the city invests the corporation with powers and rights to take property upon trust for charitable purposes, which are not otherwise obnoxious to legal animadversion.

The two acts of March and April, 1832, passed by the legislature of Pennsylvania, are a legislative interpretation of the charter of Philadelphia, and would be sufficient hereafter to estop the legislature from contesting the competency of the corporation to take the property and execute the trusts.

If the trusts were in themselves valid, but the corporation incompetent to execute them, the heirs of the devisor could not take advantage of such inability; it could only be done by the state in its sovereign capacity, by a *quo warranto*, or other proper judicial proceeding.

The trusts mentioned in the will of Stephen Girard are of an eleemosynary nature, and charitable uses, in a judicial sense. Donations for the establishment of colleges, schools, and seminaries of learning, and especially such as are for the education of orphans and poor scholars are charities in the sense of the common law.

The decision of the Supreme Court of Pennsylvania in the case of Zimmerman v. Andres, (January term, 1844,) recognised and confirmed, viz.: "That the conservative provisions of the statute of 43 Elizabeth, chap. 4, have been in force in Pennsylvania by common usage and constitutional recognition, and not only these but the more extensive range of charitable uses which chancery supported before that statute and beyond it."

Vidal et al. *v.* Girard's Executors.

The present case distinguished from the case of the Trustees of the Philadelphia Baptist Association *v.* Hart's executors, 4 Wheat. 1, upon two grounds, viz.:

1. That the case in Wheaton arose under the law of Virginia, in which state the statute of 43 Elizabeth, chap. 4, had been expressly and entirely abolished by the legislature, so that no aid whatever could be derived from its provisions to sustain the bequest.

2. That the donees were an unincorporated association which had no legal capacity to take and hold the donation in succession for the purposes of the trust, and the beneficiaries were also uncertain and indefinite.

The decisions and *dicta* of English judges, and the recent publication of the Record Commissioners in England, examined as to the jurisdiction of chancery over charitable devises anterior to the statute of 43 Elizabeth.

This part of the common law was in force in Pennsylvania, although no court having equity powers now exists or has existed, capable of enforcing such trusts.

The exclusion of all ecclesiastics, missionaries, and ministers of any sort from holding or exercising any station or duty in a college, or even visiting the same; or the limitation of the instruction to be given to the scholars, to pure morality, general benevolence, a love of truth, sobriety, and industry; are not so derogatory and hostile to the Christian religion as to make a devise for the foundation of such a college void according to the constitution and laws of Pennsylvania.

THIS case came up by appeal from the Circuit Court of the United States, sitting as a court of equity, for the eastern district of Pennsylvania.

The object of the bill filed in the court below was to set aside a part of the will of the late Stephen Girard, under the following circumstances :—

Girard, a native of France, was born about the middle of the last century. Shortly before the declaration of independence he came to the United States, and before the peace of 1783 was a resident of the city of Philadelphia, where he died, in December, 1831, a widower and without issue. Besides some real estate of small value near Bordeaux, he was, at his death, the owner of real estate in this country which had cost him upwards of $1,700,000, and of personal property worth not less than $5,000,000. His nearest collateral relations were, a brother, one of the original complainants, a niece, the other complainant, who was the only issue of a deceased sister, and three nieces who were defendants, the daughters of a deceased brother.

The will of Mr. Girard, with two codicils, was proved at Philadelphia on 31st of December, 1831.

After sundry legacies and devises of real property to various persons and corporations, the will proceeds thus :—

XX. And, whereas, I have been for a long time impressed with the importance of educating the poor, and of placing them, by the early cultivation of their minds and the developments of their moral principles, above the many temptations, to which, through poverty and ignorance, they are exposed ; and I am particularly desirous to provide for such a number of poor male white orphan children, as can be trained in one institution, a better education, as well as a more comfortable maintenance, than they usually receive from the application of the public funds : and whereas, together with the object just adverted to, I have sincerely at heart the welfare of the city of Philadelphia, and, as a part of it, am desirous to improve the neighbourhood of the river Delaware, so that the health of the citizens may be promoted and preserved, and that the eastern part of the city may be made to correspond better with the interior. Now, I do give, devise and bequeath all the residue and remainder of my real and personal estate of every sort and kind wheresoever situate, (the real estate in Pennsylvania charged aforesaid,) unto "the Mayor, Aldermen, and Citizens of Philadelphia," their successors and assigns, in trust, to and for the several uses, intents, and purposes hereinafter mentioned and declared of and concerning the same, that is to say : so far as regards my real estate in Pennsylvania, in trust, that no part thereof shall ever be sold or alienated by the said mayor, aldermen, and citizens of Philadelphia, or their successors, but the same shall for ever thereafter be let from time to time, to good tenants, at yearly, or other rents; and upon leases in possession not exceeding five years from the commencement thereof, and that the rents, issues, and profits arising therefrom shall be applied towards keeping that part of the said real estate situate in the city and liberties of Philadelphia constantly in good repair, (parts elsewhere situate to be kept in repair by the tenants thereof, respectively,) and towards improving the same, whenever necessary, by erecting new buildings, and that the nett residue (after paying the several annuities herein-before provided for) be applied to the same uses and purposes as are herein declared of and concerning the residue of my personal estate : and so far as regards my real estate in Kentucky, now under the care of Messrs. Triplett and Brumley, in trust, to sell and dispose of the same, whenever it may be expedient to do so, and to apply the proceeds of such sale to the same uses and purposes as are

herein declared of and concerning the residue of my personal estate.

XXI. And so far as regards the residue of my personal estate, in trust, as to two millions of dollars, part thereof, to apply and expend so much of that sum as may be necessary, in erecting, as soon as practicably may be, in the centre of my square of ground between High and Chestnut streets, and Eleventh and Twelfth streets, in the city of Philadelphia, (which square of ground I hereby devote for the purposes hereinafter stated, and for no other, for ever,) a permanent college, with suitable out-buildings, sufficiently spacious for the residence and accommodation of at least three hundred scholars, and the requisite teachers and other persons necessary in such an institution as I direct to be established, and in supplying the said college and out-buildings with decent and suitable furniture, as well as books and all things needful to carry into effect my general design.

The said college shall be constructed with the most durable materials, and in the most permanent manner, avoiding needless ornament, and attending chiefly to the strength, convenience, and neatness of the whole: It shall be at least one hundred and ten feet east and west, and one hundred and sixty feet north and south, and shall be built on lines parallel with High and Chestnut streets and Eleventh and Twelfth streets, provided those lines shall constitute at their junction right angles. It shall be three stories in height, each story at least fifteen feet high in the clear from the floor to the cornice. It shall be fire-proof inside and outside. The floors and the roof to be formed of solid materials, on arches turned on proper centres, so that no wood may be used, except for doors, windows, and shutters. Cellars shall be made under the whole building, solely for the purposes of the institution, &c. &c. &c., (and then follows a long and exceedingly minute description of the manner in which the building shall be erected.)

When the college and appurtenances shall have been constructed, and supplied with plain and suitable furniture and books, philosophical and experimental instruments and apparatus, and all other matters needful to carry my general design into execution, the income, issues, and profits of so much of the said sum of two millions of dollars as shall remain unexpended, shall be applied to maintain the said college according to my directions.

1. The institution shall be organized as soon as practicable, and to accomplish that purpose more effectually, due public notice of the

Vidal et al. v. Girard's Executors.

intended opening of the college shall be given, so that there may be an opportunity to make selections of competent instructors and other agents, and those who may have the charge of orphans may be aware of the provisions intended for them.

2. A competent number of instructors, teachers, assistants, and other necessary agents, shall be selected, and when needful, their places from time to time supplied. They shall receive adequate compensation for their services; but no person shall be employed who shall not be of tried skill in his or her proper department, of established moral character, and in all cases persons shall be chosen on account of their merit, and not through favour or intrigue.

3. As many poor white male orphans, between the ages of six and ten years, as the said income shall be adequate to maintain, shall be introduced into the college as soon as possible; and from time to time as there may be vacancies, or as increased ability from income may warrant, others shall be introduced.

4. On the application for admission, an accurate statement should be taken in a book prepared for the purpose, of the name, birthplace, age, health, condition as to relatives, and other particulars useful to be known of each orphan.

5. No orphan should be admitted until the guardians or directors of the poor, or a proper guardian or other competent authority shall have given, by indenture, relinquishment, or otherwise, adequate power to the mayor, aldermen, and citizens of Philadelphia, or to directors, or others by them appointed, to enforce, in relation to each orphan, every proper restraint, and to prevent relatives or others from interfering with, or withdrawing such orphan from the institution.

6. Those orphans, for whose admission application shall first be made, shall be first introduced, all other things concurring—and at all future times, priority of application shall entitle the applicant to preference in admission, all other things concurring; but if there shall be, at any time, more applicants than vacancies, and the applying orphans shall have been born in different places, a preference shall be given—first, to orphans born in the city of Philadelphia; secondly, to those born in any other part of Pennsylvania; thirdly, to those born in the city of New York, (that being the first port on the continent of North America at which I arrived;) and lastly, to those born in the city of New Orleans, being the first port on the said continent at which I first traded, in the first instance as first officer, and subsequently as master and part-owner of a vessel and cargo.

7. The orphans admitted into the college shall be there fed with plain but wholesome food, clothed with plain but decent apparel, (no distinctive dress ever to be worn,) and lodged in a plain but safe manner: due regard shall be paid to their health, and to this end their persons and clothes shall be kept clean, and they shall have suitable and rational exercise and recreation.    They shall be instruct- ed in the various branches of a sound education, comprehending reading, writing, grammar, arithmetic, geography, navigation, sur- veying, practical mathematics, astronomy, natural, chemical, and experimental philosophy, the French and Spanish languages, (I do not forbid, but I do not recommend the Greek and Latin languages,) —and such other learning and science as the capacities of the seve- ral scholars may merit or warrant.    I would have them taught facts and things, rather than words or signs; and especially, I desire, that by every proper means a pure attachment to our republican institu- tions, and to the sacred rights of conscience, as guarantied by our happy constitutions, shall be formed and fostered in the minds of the scholars.

8. Should it unfortunately happen, that any of the orphans admit- ted into the college shall, from mal-conduct, have become unfit com- panions for the rest, and mild means of reformation prove abortive, they should no longer remain therein.

9. Those scholars who shall merit it, shall remain in the college until they shall respectively arrive at between fourteen and eighteen years of age; they shall then be bound out by the mayor, aldermen, and citizens of Philadelphia, or under their direction, to suitable occupations—as those of agriculture, navigation, arts, mechanical trades, and manufactures, according to the capacities and acquire- ments of the scholars respectively, consulting, as far as prudence shall justify it, the inclinations of the several scholars, as to the occu- pation, art, or trade to be learned.

In relation to the organization of the college and its appendages, I leave, necessarily, many details to the mayor, aldermen, and citi- zens of Philadelphia, and their successors; and I do so with the more confidence, as, from the nature of my bequests and the benefit to result from them, I trust that my fellow-citizens of Philadelphia will observe and evince especial care and anxiety in selecting members for their city councils, and other agents.

There are, however, some restrictions, which I consider it my duty to prescribe, and to be, amongst others, conditions on which

my bequest for said college is made and to be enjoyed, namely:—
First, I enjoin and require, that if, at the close of any year, the income
of the fund devoted to the purposes of the said college shall be more
than sufficient for the maintenance of the institution during that year,
then the balance of the said income, after defraying such maintenance,
shall be forthwith invested in good securities, thereafter to be and
remain a part of the capital; but, in no event, shall any part of the
said capital be sold, disposed of, or pledged, to meet the current
expenses of the said institution, to which I devote the interest, income,
and dividends thereof, exclusively: Secondly, I enjoin and require
that no ecclesiastic, missionary, or minister of any sect whatsoever,
shall ever hold or exercise any station or duty whatever in the said
college; nor shall any such person ever be admitted for any purpose,
or as a visitor, within the premises appropriated to the purposes of
the said college.

In making this restriction, I do not mean to cast any reflection
upon any sect or person whatsoever; but, as there is such a multi-
tude of sects, and such a diversity of opinion amongst them, I desire
to keep the tender minds of the orphans, who are to derive advantage
from this bequest, free from the excitement which clashing doctrines
and sectarian controversy are so apt to produce; my desire is, that
all the instructors and teachers in the college shall take pains to instil
into the minds of the scholars the purest principles of morality, so
that, on their entrance into active life, they may, from inclination and
habit, evince benevolence towards their fellow-creatures, and a love
of truth, sobriety, and industry, adopting at the same time such reli-
gious tenets as their matured reason may enable them to prefer.

If the income arising from that part of the said sum of two millions
of dollars, remaining after the construction and furnishing of the col-
lege and outbuildings, shall, owing to the increase of the number of
orphans applying for admission, or other cause, be inadequate to the
construction of new buildings, or the maintenance and education of
as many orphans as may apply for admission, then such further sum
as may be necessary for the construction of new buildings, and the
maintenance and education of such further number of orphans, as can
be maintained and instructed within such buildings as the said square
of ground shall be adequate to, shall be taken from the final residuary
fund, hereinafter expressly referred to, for the purpose, comprehending
the income of my real estate in the city and county of Philadelphia,
and the dividends of my stock in the Schuylkill Navigation Company

M

—my design and desire being, that the benefits of said institution shall be extended to as great a number of orphans as the limits of the said square and buildings therein can accommodate.

XXII. And as to the further sum of five hundred thousand dollars, part of the residue of my personal estate, in trust, to invest the same securely, and to keep the same so invested, and to apply the income thereof exclusively to the following purposes, that is to say—(then follows an enumeration of the objects to which the income of the fund is to be applied, being the improvement of the eastern part of the city.)

XXIII. I give and bequeath to the commonwealth of Pennsylvania, the sum of three hundred thousand dollars, for the purpose of internal improvement by canal navigation, to be paid into the state treasury by my executors, as soon as such laws shall have been enacted by the constituted authorities of the said commonwealth as shall be necessary, and amply sufficient to carry into effect, or to enable the constituted authorities of the city of Philadelphia to carry into effect the several improvements above specified, namely: 1. Laws, to cause Delaware Avenue, as above described, to be made, paved, curbed, and lighted; to cause the buildings, fences, and other obstructions now existing, to be abated and removed, and to prohibit the creation of any such obstructions to the eastward of said Delaware Avenue; 2. Laws, to cause all wooden buildings, as above described, to be removed, and to prohibit their future erection within the limits of the city of Philadelphia; 3. Laws, providing for the gradual widening, regulating, paving, and curbing Water street, as hereinbefore described, and also for the repairing the middle alleys, and introducing the Schuylkill water, and pumps, as before specified—all which objects may, I persuade myself, be accomplished on principles at once just in relation to individuals, and highly beneficial to the public: the said sum, however, not to be paid, unless said laws be passed within one year after my decease.

XXIV. And as it regards the remainder of said residue of my personal estate, in trust, to invest the same in good securities, and in like manner to invest the interests and income thereof from time to time, so that the whole shall form a permanent fund, and to apply the income of the said fund:

1st. To the further improvement and maintenance of the aforesaid college, as directed in the last paragraph of the XXIst clause of this will.

2d. To enable the corporation of the city of Philadelphia to provide more effectually than they now do, for the security of the persons and property of the inhabitants of the said city, by a competent police, including a sufficient number of watchmen, really suited to the purpose; and to this end, I recommend a division of the city into watch districts, or four parts, each under a proper head, and that at least two watchmen shall, in each round or station, patrole together.

3d. To enable the said corporation to improve the city property, and the general appearance of the city itself, and, in effect, to diminish the burden of taxation, now most oppressive, especially on those who are the least able to bear it.

To all which objects, the prosperity of the city, and the health and comfort of its inhabitants, I devote the said fund as aforesaid, and direct the income thereof to be applied yearly and every year for ever, after providing for the college as hereinbefore directed, as my primary object. But, if the said city shall knowingly and wilfully violate any of the conditions hereinbefore and hereinafter mentioned, then I give and bequeath the said remainder and accumulations to the commonwealth of Pennsylvania, for the purposes of internal navigation; excepting, however, the rents, issues, and profits of my real estate in the city and county of Philadelphia, which shall for ever be reserved and applied to maintain the aforesaid college, in the manner specified in the last paragraph of the XXIst clause of this will: And if the commonwealth of Pennsylvania shall fail to apply this or the preceding bequest to the purposes before mentioned, or shall apply any part thereof to any other use, or shall, for the term of one year from the time of my decease, fail or omit to pass the laws hereinbefore specified for promoting the improvement of the city of Philadelphia, then I give, devise, and bequeath the said remainder and accumulations (the rents aforesaid always excepted and reserved for the college as aforesaid) to the United States of America, for the purposes of internal navigation, and no other.

Provided, nevertheless, and I do hereby declare, that all the preceding bequests and devises of the residue of my estate to the mayor, aldermen, and citizens of Philadelphia, are made upon the following express conditions, that is to say; First, That none of the moneys, principal, interest, dividends, or rents, arising from the said residuary devise and bequest, shall at any time be applied to any other purpose or purposes whatever, than those herein mentioned and appointed. Second, That separate accounts, distinct from the other

accounts of the corporation, shall be kept by the said corporation, concerning the said devise, bequest, college, and funds, and of the investment and application thereof; and that a separate account or accounts of the same shall be kept in bank, not blended with any other account, so that it may at all times appear on examination by a committee of the legislature, as hereinafter mentioned, that my intentions had been fully complied with.    Third, That the said corporation render a detailed account annually, in duplicate, to the legislature of the commonwealth of Pennsylvania, at the commencement of the session, one copy for the Senate, and the other for the House of Representatives, concerning the said devised and bequeathed estate, and the investment and application of the same, and also a report in like manner of the state of the said college, and shall submit all their books, papers, and accounts touching the same, to a committee or committees of the legislature for examination, when the same shall be required.

Fourth, The said corporation shall also cause to be published in the month of January, annually, in two or more newspapers, printed in the city of Philadelphia, a concise but plain account of the state of the trusts, devises, and bequests herein declared and made, comprehending the condition of the said college, the number of scholars, and other particulars needful to be publicly known, for the year next preceding the said month of January, annually.

(The 25th section related to the winding up of the Girard Bank, and the 26th appointed Timothy Paxon, Thomas P. Cope, Joseph Roberts, William J. Duane, and John A. Barclay, Executors.    Then followed the execution of the will, in regular form, on the 16th day of February, 1830.)

Whereas, I, Stephen Girard, the testator named in the foregoing will and testament, dated the sixteenth day of February, eighteen hundred and thirty, have, since the execution thereof, purchased several parcels and pieces of real estate, and have built sundry messuages, all which, as well as any real estate that I may hereafter purchase, it is my wish and intention to pass by the said will: Now, I do hereby republish the foregoing last will and testament, dated February 16, 1830, and do confirm the same in all particulars.

In witness, I, the said Stephen Girard, set my hand and seal hereunto, the twenty-fifth day of December, eighteen hundred and thirty.

STEPHEN GIRARD. [L. S.]

Vidal et al. *v.* Girard's Executors.

Signed, sealed, published, and declared by the said Stephen Girard, as and for a republication of his last will and testament, in the pre ace of us, who, at his request, have hereunto subscribed our names as witnesses thereto, in the presence of the said testator and of each other, December 25th, 1830.

> JOHN H. IRWIN,
> SAMUEL ARTHUR,
> JNO. THOMSON.

Whereas I, Stephen Girard, the testator named in the foregoing will and testament, dated February 16th, 1830, have since the execution thereof, purchased several parcels and pieces of land and real estate, and have built sundry messuages, all of which, as well as any real estate that I may hereafter purchase, it is my intention to pass by said will; and whereas, in particular, I have recently purchased from Mr. William Parker, the mansion-house, out-buildings, and forty-five acres and some perches of land, called Peel Hall, on the Ridge road, in Penn Township: Now, I declare it to be my intention, and I direct, that the orphan establishment, provided for in my said will, instead of being built as therein directed upon my square of ground between High and Chestnut and Eleventh and Twelfth streets, in the city of Philadelphia, shall be built upon the estate, so purchased from Mr. W. Parker, and I hereby devote the said estate to that purpose, exclusively, in the same manner as I had devoted the said square, hereby directing that all the improvements and arrangements for the said orphan establishment, prescribed by my said will, as to said square, shall be made and executed upon the said estate, just as if I had in my will devoted the said estate to said purpose—consequently, the said square of ground is to constitute, and I declare it to be a part of the residue and remainder of my real and personal estate, and given and devised for the same uses and purposes, as are declared in section twenty of my will, it being my intention, that the said square of ground shall be built upon, and improved in such a manner, as to secure a safe and permanent income for the purposes stated in said twentieth section.

In witness whereof, I, the said Stephen Girard, set my hand and seal hereunto, the twentieth day of June, eighteen hundred and thirty-one.

STEPHEN GIRARD [L. S.]

Signed, sealed, published, and declared, by the said Stephen Girard, as and for a republication of his last will and testament, and a

further direction in relation to the real estate therein mentioned, in the presence of us, who, at his request, have hereunto subscribed our names as witnesses thereto, in the presence of the said testator, and of each other, June 20, 1831.

S. H. CARPENTER,

L. BARDIN,

SAMUEL ARTHUR.

The executors named in the will, duly proved the same with the codicils before the register of wills for the city and county of Philadelphia, obtained letters testamentary thereon, and took upon themselves the burden of the execution thereof. Inventories and supplementary inventories of the estate were filed, debts and legacies paid, and large sums of money paid to the residuary legatees. The accounts of the executors were filed in the office of the register of wills, from which they passed, in due course of legal proceedings, to the Orphan's Court for the city and county of Philadelphia.

An act of the legislature of Pennsylvania, of 24th March, 1832, " To enable the Mayor, Aldermen, and Citizens of Philadelphia to carry into effect certain improvements, and to execute certain trusts," recites the bequest of $500,000, in Stephen Girard's will, sect. 22, to the mayor, aldermen, and citizens of Philadelphia, in trust, &c., and " for the purpose of enabling the mayor, aldermen, and citizens of Philadelphia, aforesaid, to effect the improvements contemplated by the said testator, and to execute in all other respects the trusts created by his will, to enable the constituted authorities of the city of Philadelphia to carry which into effect, the said Stephen Girard has desired the legislature to enact the necessary laws." Sections 1 to 9 contain enactments stipulated by the testator in sect. 23 of the will, as the condition on which $300,000 was bequeathed to the commonwealth of Pennsylvania.

" And forasmuch as in the course of time it may appear that powers are not vested in the said, the mayor, aldermen and citizens of Philadelphia, which may be yet required, to the full execution of those parts of the said will of the said Stephen Girard, for the carrying of which into effect he has in his said will requested legislative provision, and it is the object and intent of this act fully to confer all such powers.

" Sect. 10. Be it further, &c., That it shall be lawful for the mayor, aldermen, and citizens of Philadelphia, to exercise all such jurisdiction, enact all such ordinances, and do and execute all such acts and

things whatsoever as may be necessary and convenient for the full and entire acceptance, execution and prosecution, of any and all the devises and bequests, trusts and provisions, contained in the said will, which are the subjects of the preceding parts of this act, and to enable the constituted authorities of the city of Philadelphia to carry which into effect, the said Stephen Girard has desired the legislature to enact the necessary laws.

"Sect. 11. And be it further, &c., That no road or street shall be laid out or passed through the land in the county of Philadelphia, bequeathed by the late Stephen Girard for the erection of a college, unless the same shall be recommended by the trustees or directors of the said college, and approved of by a majority of the Select and Common Councils of the city of Philadelphia."

By another act, passed on the 4th of April, 1832, entitled "A supplement to the act entitled 'An act to enable the Mayor, Aldermen, and Citizens of Philadelphia, to carry into effect certain improvements, and to execute certain trusts,' " the Select and Common Council of the city of Philadelphia, are authorized to provide by ordinance, or otherwise, for the election or appointment of such officers or agents as they may deem essential to the due execution of the duties and trusts enjoined and created by the will of the late Stephen Girard.

In October, 1836, some of the heirs of Stephen Girard filed a bill upon the equity side of the Circuit Court of the United States for the eastern district of Pennsylvania, against the corporation of Philadelphia, the executors, and some of the nieces of Girard, who were made co-defendants. The claim, as presented in the original bill, amended bill, and bill of revivor, (in which Henry Stump is made a party as the administrator of one of the deceased complainants,) is as follows:—

"Your orator and oratrix further show, that amongst other things in their original bill, they have alleged and charged that the testator, Stephen Girard, by a supposed devise in his last will and testament, has in the first place appropriated two millions of dollars to the mayor, aldermen, and citizens of Philadelphia, in trust, for the erection and endowment of a college, for the maintenance and education of a class of orphans, attempted to be described by the said testator in his will.

"And your orator and oratrix further state, that in their original bill, they set out that the said testator, in and by his will, after appropri-

ating the two millions of dollars as aforesaid, by another supposed devise, dedicated the whole of the residuum of his real and personal estate, with certain exceptions mentioned in the said original bill, to the mayor, aldermen, and citizens of Philadelphia, in trust, for the progressive enlargement of said college, and that there are no other limitations to the number of orphans to be ultimately admitted into the said college, nor to the cost nor extent of the establishment, but the number and extent of the collegiate buildings and their append- ages, that may from time to time be erected within the entire area of forty-five acres and some perches of land, being a country-seat called Peel Hall; so that in effect there is no devise over of any part of the said residuum of the real and personal estate of the testator, to any other use, purpose, or object, after deducting the appropriations that are excepted in the original bill, than the charity connected with the establishment of said college, except it be contingently, in case the said college establishment be not made, as it is contemplated to be, capable of absorbing the whole of the said residuum of the real and personal estate, intended to be devised in trust as aforesaid, as by a reference to the said original bill and exhibits, which your complain- ants pray may be taken as part of this bill, will more fully appear.

" Your complainants suggest and insist to be available, that it will be decided, from a true exposition and construction of said will, which is submitted to the court, that it was the intention of the tes- tator to dedicate the whole of the rents, issues, and profits of his real estate in the city and county of Philadelphia, in trust, exclusively to the uses and purposes of the charity connected with said college, and not that the said real estate, or the rents, issues, and profits thereof are to be contingently applied to any other use or purpose, unless it be to the payment of a ratable proportion of certain annuities charged on the real estate of the testator, in the state of Pennsylvania, by the eighteenth clause in his will.

" And your orator and oratrix further aver and expressly charge, that the charity connected with the college, if the establishment is erected and managed according to the directions of the testator, and the necessary buildings constructed so as to fill up and improve the whole area of forty-five acres and some perches of land, will require and consume the whole of the residuum of his real and personal estate, attempted to be devised as aforesaid for the purposes of erect- ing, progressively enlarging, and perpetually maintaining said colle- giate establishment, for the support and education of as great a number

of orphans as the testator directs to be admitted therein, so that there will be no surplus of said residuum of his real and personal estate supposed to be devised in trust as aforesaid, to be appropriated to any other objects or purposes designated by the testator in his will. And your orator and oratrix aver, that there is no devise over for any other purpose upon any contingency of the said two millions of dollars, supposed to be devised to the mayor, aldermen, and citizens of Philadelphia, in trust, for the erection and endowment of said college, and that no part of said two millions of dollars, according to the will of the testator, can be applied in any event to any other use, purpose or object, except to the charitable objects depending upon the erection, endowment and perpetual support of said college. And your orator and oratrix aver and insist to be available, that the said supposed devise of two millions of dollars to the mayor, aldermen, and citizens of Philadelphia, in trust, for the erection and endowment of said college, for the benefits of uncertain objects of charity, supposed to be intended by the testator, is void.

" And your complainants maintain, that the mayor, aldermen, and citizens of Philadelphia, were at the death of the testator, incapable of executing any such trust, or of taking and holding a legal estate for the benefit of others; and that whatever may be the capacity of said mayor, aldermen, and citizens of Philadelphia, to hold property for the use of others, or to execute a trust, the objects for whose benefit the said devise in trust is supposed to have been made, are indefinite, vague, and uncertain, as will appear from an examination of said will; so that no trust is created that is capable of being executed, or is cognisable either at law or in equity, and no estate passed by said supposed devise, that can vest in any existing or ascertainable *cestui que trusts;* that if the objects or persons for whose benefit the said devise is supposed to have been made, were susceptible of ascertainment, yet such beneficiaries, when ascertained, would be wholly incapable of transmitting their equitable title in perpetual succession, so that the said two millions of dollars, for want of a good and effectual devise, has descended by operation of the law governing descents in the state of Pennsylvania, and the treaty stipulations between France and the United States, to the heirs at law of Stephen Girard, the testator, according as such laws and treaty stipulations affect the rights of such of the heirs as are aliens and such as are citizens of the United States.

" Your orator and oratrix expressly charge in their original bill, that

the said supposed devise to the mayor, aldermen, and citizens of Philadelphia, in trust of the whole of the *residuum* of the real and personal estate of the testator, for the erection, progressive enlargement, and perpetual support of said college, is void, and that your complainants were heirs at law of said testator, and each entitled to one third part of the estate of the testator, undisposed of or ineffectually disposed of by his last will, according to the law governing descents in the state of Pennsylvania, and the treaty stipulations between France and the United States; and that the testator at the time of his death left certain other heirs, namely, Maria Antoinetta, wife of John Hemphill, Henrietta, wife of John Y. Clark, and Caroline, wife of John Haslam, which said Maria, Henrietta, and Caroline, are nieces of the said testator, and daughters of John Girard, late of Philadelphia, deceased, and they and their husbands, except the husband of said Caroline, are all made defendants to said bill, together with Mark Richards, who is the trustee of Caroline, all of which said defendants are citizens of the state of Pennsylvania. And your orator and oratrix further allege that the last named heirs are the only persons entitled besides your complainants to any part of the real or personal estate of which the said testator died seised or possessed, and which remained undisposed of or ineffectually devised by his will.

"And your complainants, as they are informed, verily believe and expressly charge, that notwithstanding the invalidity of said supposed devise or devises in trust, the said mayor, aldermen, and citizens of Philadelphia, soon after the death of the testator entered upon and possessed themselves of the two millions of dollars, supposed to be devised to them in trust for the erection and support of said college, and also of the whole of the *residuum* of the real and personal estate of the testator, supposed to be devised to them for the same purposes, and have ever since continued to hold and manage the same according to the terms of said supposed trust, or under the pretext of applying the said two millions of dollars, and the said *residuum* of the real and personal estate of the testator, to the supposed objects and purposes of said trust; that they have altogether refused to account to your complainants or to pay over to them any part of their distributive shares, either of the said two millions of dollars or of the *residuum* of the real and personal estate, to which they are entitled, but intending artfully and fraudulently to evade and baffle the reasonable and just claims of your complainants; and the relief prayed for in the

original bill, they have neglected to answer fully, either as to the amount or value of the real or personal estate they have entered upon or received from the estate of the testator, under colour of said trust; and your complainants pray that in order to obtain the relief and equity prayed for, the said mayor, aldermen, and citizens of Phila-delphia, be compelled to answer and discover," &c. &c.

[The bill then prayed a general discovery and account from all parties.]

The defendants all answered, and the executors filed full accounts of all their transactions.   A commission to take testimony was issued to France, in order to establish the relationship existing between the complainants and the deceased.

Under the act of 1832, the corporation of Philadelphia passed an ordinance providing for the building of the college, and the board of trustees created thereby was organized in March, 1833.   The building was commenced and carried on from year to year under the direction of the authorities appointed in this ordinance.

On the 28th April, 1841, the cause came on for hearing in the Circuit Court upon the bill, amended bill, and bill of revivor, answers, replications, depositions, and exhibits, when, after argument of counsel, it was ordered, adjudged, and decreed, that the complain-ants' bill be dismissed with costs.

The complainants appealed to this court.

*Jones* and *Webster*, for the appellants, who were also the complain-ants below.

*Binney* and *Sergeant*, for the defendants.

*Jones* made the three following points:

1. That the bequest of the college fund is to this amount void, by reason of the uncertainty of the designation of the beneficiaries or *cestui que trusts* of the legacy.

2. That the corporation of the city of Philadelphia is not author-ized by its charter to administer the trusts of this legacy, and that the intentions of the testator would be defeated by the substitution of any other trustee.

3. That if otherwise capable of taking effect, the trust would be void, because the plan of education proposed is anti-christian, and therefore repugnant to the law of Pennsylvania, and is also opposed to the provision of Art. IX. sect. iii. of the Constitution of Penn-

sylvania, that "no human authority can in any case whatever control or interfere with the rights of conscience."

If the first point should be established and the second not, the corporation would become trustees for the complainants. 8 Peters, 326; King *v.* Mitchell, 1 Merivale, 336; 2 North Carolina Rep. 557; 2 Devereux, 309; 10 Vesey, 535.

The city of Philadelphia claims as a residuary legatee, even if the trust should be declared void, but there are two answers to this, first, that a trust bars the residuary interest, and, second, that the *residuum* is divided into parts. Ambler, 580; 1 Johnson, 571.

In real estate, the residuary devisee never had a lapsed devise.

The bequest of the college fund is void by reason of the uncertainty of the *cestui que trusts*.

At common law and prior to the statute 43 Elizabeth, such devises were void, and that statute is not in force in Pennsylvania. Duke, 125; Delford on Mortmain, 43.

The statute 5 Elizabeth, reviving a statute of Henry 8, says, henceforth it shall be lawful, &c., implying that it was not lawful before.

In England formerly all charities were under the care of the ecclesiastical courts. At the Reformation they were withdrawn from the church, and paupers thrown upon the public. Henry 8 was glad to find some other way of supporting them, and Elizabeth encouraged private persons to found charities with the same view. But since her day, the source of the power which chancery has exercised over charities in England has been the prerogative of the crown, and this prerogative law never could have been introduced into the colonies. Jurisdiction over the three subjects of lunatics, infants, and charities has always gone together, and been claimed because the king is said to be *parens patriæ*. 1 Bla. Com. 303; 3 Bla. Com. 47.

The king, in his judicial capacity, through the chancellor, and exercising an extraordinary jurisdiction, takes control of these things. 3 Bla. Com. 427; 1 Fonblanque, 57, note; 2 Fonblanque, 207, 235; Shepherd on Wills, 208; Chitty's Prerogative Law, 155, 161; 2 Atkyns, 553, where Lord Hardwicke says it is a personal authority of the chancellor.

The jurisdiction over charities is not within the ordinary powers of equity, but falls back upon the king's prerogative. Sir Francis More, 188; Hobart, 138; 13 Vesey, 248.

It must be an extra-judicial function to set aside a will. How

could this power have passed over to a revolutionized and republican state? In England, if the chancellor could not entertain jurisdiction, he referred the case to the king, who acted under his sign manual, but to whom can an American chancellor refer it? In an elective republic it is impossible to have such a person. These vague charities cannot be sustained unless by virtue of some peculiar law, and it is an alarming event that two millions of property are put into perpetual mortmain for the benefit of persons not even incorporated, not even a religious or mechanical society.

The municipal law of Pennsylvania consists of the law of nations, the common law of England, and some of the British statutes. The report of the judges made to the legislature in 1808, (3 Binney, 320,) says that parts of the statutes 7 Edward 1; 13 Edward 1; 15 Richard 2; and 23 Henry 8, commonly called statutes of mortmain, are in force in the state. 1 Dallas, 67, 70, 444, 114.

The old remedy of assize was revived because the statute of Edward was considered to be in force in consequence of the report. 17 Serg. and Rawle, 174. The preface to the report says it was necessary to examine the whole code. But the statute of Elizabeth is not included amongst those in force. How then can it get in, unless by some act of the legislature, which is not contended?

If the statute was in affirmance of the common law, the judges would have reported it as being in operation, because the common law was itself in force. 9 Serg. and Rawle, 348, 349.

The first constitution of Pennsylvania, art. 7; art. 3, sect. 3, and 24 sect. (1 Dallas's Laws, appendix,) show that there is no power provided to carry out the king's prerogative.

[Mr. *Jones* then went into a minute and critical examination of the colonial records of Pennsylvania, to show that from the proceedings of the governor and assembly it was not believed that a power existed to sustain these religious charities, referring amongst other matters to the charter of the Presbyterian church in 1772.]

After the Revolution, the first case that occurred to test these principles was 17 Serg. and Rawle, 88, Witman *v.* Lex; but the bequests in this case were good by the common law without the aid of the statute of Elizabeth, which was decided not to be in force.

2. As to the capacity of the trustee to take.

The powers of the corporation are limited, and a trust beyond those powers cannot be executed. 4 Wheat. 636; 9 Watts, 551; 6 Connecticut Reports, 304; 1 Vesey, sen. 534.

If the city of Philadelphia is the trustee, the estate is in one body and the execution of the trust in another, for all the people are a part of the corporation. The head of the corporation cannot be separated from the body.

In ordinary cases, where there is no trustee, the court may appoint one; but this cannot be done here, because the trustee, being a corporation, has perpetuity, and a similar one must be selected. 4 Wheat. 28; 1 Vesey, sen. 534; Duke, 245.

A part of this devise would make it a curse to any civilized land; it is a cruel experiment upon poor orphan boys to shut them up and make them the victims of a philosophical speculation. By the laws of Pennsylvania it is blasphemy to attack the Christian religion, but in this case nothing is to be taught but the doctrines of a pure morality, and all the advantages of early impressions upon the youthful mind are entirely abrogated.

*Binney*, for the defendants,

(Argued that under the true construction of the will, the heirs of Girard could not take even if the devise for the college should be set aside; because the city of Philadelphia would come in as residuary legatee; the income of the fund being applied, in such case, to "diminishing the burden of taxation," and other public objects specifically pointed out. This part of the argument is omitted, because the decision of the court is placed upon other grounds. Mr. Binney then proceeded to comment on the objections to the devise, which had been made by the counsel on the other side.)

The objection made by the counsel on the other side is twofold: first, that the city is incapable of taking a legal estate by devise; and second, that the trust is void, because the beneficiaries are too uncertain. The first point was not pressed, and is considered as abandoned. As to the second, this charity is as precise as any which has ever been established. The trust is to build upon a place specially marked out; the children are to be poor, born in Philadelphia, then New York, then New Orleans. The description is specific and limited. In England, a charity, however general, always succeeds; there is no case in which it has failed. The only question there is about its administration; whether by the chancellor in his ordinary jurisdiction, or under the sign manual of the crown. The statute 32, 34 Henry 8, which forbade devises to corporations in mortmain, never was in force in Pennsylvania. The settlers agreed in England upon the laws which should govern them.

White and Brockden's History of Laws, Appendix 1, says that wills, &c., in writing and attested should have the same force as to land that conveyances had. This was on 5th May, 1682. The same rule was established on the 7th December, 1682, if the will were proved in forty days. Same book, Appendix 4, chapter 45.

On the 1st January, 1693, this law was in force. The legislature requested the governor to declare what laws were in force, who complied and declared that this was, amongst others. Same book, Appendix 7, 8.

In 1683, a law restrained the testator, if he had a wife and child, from willing away more than one-third; but in 1693, the full power was restored. Same book, Appendix 9.

After a slight alteration, (see Appendix 12,) the statute of wills was passed in 1705, which was in force until Girard's death. It declares that wills in writing, and attested, shall be good as conveyances. The power to make a will is general, and to devise to any one. If corporations, therefore, can take by deed, they can by devise.

The corporation has power to take. If the statutes of mortmain are in force, they do not intercept the grant on its way to the corporation; there must be an office found to escheat the property to the state. 7 Serg. and Rawle, 313; 14 Peters, 122; Shelford, 8.

The policy of the mortmain statutes of England has not been adopted in Pennsylvania. The act of 1791 (Purdon, 182, 183) forbids corporations from holding property " exceeding £500 in income," but permits them to hold any quantity of unproductive land.

The statutes of mortmain do not extend to Pennsylvania. If they do, it is contrary to the English decisions about their colonies. 2 Merivale, 143; 2 Maddock's Ch. Pr. 61, note 62; 8 Wheat. 476.

If they had been considered as being in force, there would have been escheats under them; but none are found.

The rule prescribed by the court in 3 Binney, 597, was that where there was a Pennsylvania statute on the same subject with an English statute, the latter was not in force. But this could not be carried out universally, for the statute 4 Anne and the Pennsylvania law of 1714 were declared both to be in operation.

The city of Philadelphia has an unlimited power to acquire land. The charters of 1701 and 1789 both give it. 2 Smith's Laws, 462. The power is to hold to them and their successors for ever, or they can alienate it as a natural person can.

Has the city power to take in trust?

The old doctrine was that a corporation could not be seised to a use. Sugden on Uses, 10.

But it has been since settled that a corporation may be a trustee. If it receives a deed, the legal estate will pass, provided the statutes of mortmain do not prohibit it. If the trust is void, equity will decree a reconveyance; but this cannot be necessary, unless the legal estate had passed. And if a corporation is incapable of executing the trust, equity will appoint some person who is not. 1 Saunders on Uses, 346, 349; Willes on Trustees, 31; Levin on Trusts, 10, 11; 2 Thomas's Co. Litt. 706, note; 1 Cruise's Digest, 403, tit. 12, Trust, chap. 1, sect. 89.

Also, that a corporation may be a trustee. 2 Vernon, 411; 2 Bro. Par. Ca. 370; 7 Bro. Par. Ca. 235.

Where a corporation abused a trust and was dismissed, see 3 Bro. Chan. Cas. 171, 371; 4 Vesey, 453; 2 Vesey, jun. 46; 1 Vesey, 467; 14 Vesey, 253; 12 Mass. Rep. 547; 17 Serg. and Rawle, 89; 3 Rawle, 170.

The cases in 12 Mass. Rep. 547 and 17 Serg. and Rawle, 89, may not appear at first to sustain the doctrine, but the cases are right. That of 3 Rawle, 170, is very much like the present, and establishes the doctrine, that if the trust is for the welfare of the corporation, it may take it.

The acts of the legislature of Pennsylvania of 24th March and 4th April, 1832, are strong indications of what the law is in that state. That of March (sect. 10, 11) gives the corporation power to carry out the trust; enacts that no road shall pass through the land, and gives power to appoint officers. Both acts acknowledge and assist the trust, and imply that the corporation had power to take it. This is evidence of an existing power. 4 Peters, 503.

The charter of Philadelphia, (page 73 of city ordinances,) in the 16th section, grants a general power to make laws for the welfare of the people.

The case in 1 Vesey, 534, does not warrant the inference drawn from it by the counsel on the opposite side. See as to this case Boyle on Charitable Uses, 84.

As to the uncertainty of the beneficiaries:—

It is an error to suppose that a trustee must take for beneficiaries known and established. Suppose a marriage settlement for life with power to devise. Where is the estate beyond the life until the power is executed? It vests in no one. A charitable use is only a power

of appointment, and the children, in this case, when named, have a good right to the use. So it is in churches. When a minister is elected, he takes the estate according to the foundation; and so also with schoolmasters, who have sometimes a freehold. Shelford, 762, 763, 765, 767, 730.

If the trustee will not nominate, chancery will. 3 P. W. 146; 3 Atkyns, 164.

The tenure of the *cestui que use* is fixed; the boys of merit are to remain in the college until they are from fourteen to eighteen years of age. They are easily ascertainable. It is true that no one has a claim until the appointment is made. But this is the case with many trusts of private property where the estate is uncertain until certain issue are born. Where there is a power to name some one of kin to take, a remote relation may be selected. 1 Atkyns, 469; 4 Russel, 292. A power to appoint amongst "poor relations" may be either a charity in the legal sense of the term, or an ordinary provision of kindness. 7 Vesey, jun. 436; 2 Atkyns, 328; 17 Vesey, jun. 371; 1 Shoales and Lefroy, 111; Boyle on Charities, 31—34. The only difference between the two is that in the first case, it will last longer than in the other. A power of appointment is sometimes vested in particular persons from special confidence, and sometimes it passes to heirs. Charities are kept up for ever.

Uncertainty is indispensable to all charities. If any one has a right to claim by law, it ceases to be a charity.

Where did the favour with which charities are regarded, and the motive by which they are established, spring from? The doctrine is traced up to the civil law. But where did Justinian get these ideas? They came from Constantine, the first Christian emperor, and they can be traced up to a higher source than that—the Bible. The Anglo-Saxons received all their principles from the same authority. Orphan-houses were exempted from taxation. Originally the injunction of the Bible was to "honour thy father and thy mother;" but the domestic affections are selfish, and it was reserved for Christianity to enjoin the duty of "loving thy neighbour as thyself." The Jewish lawyer asked who his neighbour was, and it was hard to convince him that a Samaritan could be so. There was the same difficulty as now respecting the uncertainty of the beneficiary. The lesson of charity is taught too in the case of the woman who, in her humility, claimed only the crumbs that fell from the table, and in the beautiful parable of visiting the sick and the prisoner: "Inasmuch as ye have

done it to the least of these, ye have done it unto me." Even in the older Jewish records, we find the same lesson of philanthropy taught where the sheaf is left for the unknown and unacknowledged stranger. It is the uncertainty of the person upon whom the benefit may fall that gives merit to the action. A legacy to a friend is no charity. The first trustee for a charity was St. Paul. The sick are always uncertain; and to all hospitals, the objection now made would apply. 2 Domat. 169, title 2, sect. 3; 2 Vesey, 273; 1 Vernon, 248; 7 Vesey, 76; 17 Vesey, 371, that it becomes a charity as soon as uncertainty begins. Ambler, 422; 5 Rawle, 151; manuscript case from Pennsylvania, not yet reported, that beneficial societies are not charities.

[Mr. *Binney* then proceeded with his own argument, and stated the following points:

1. That such uses as those in Mr. Girard's will are good at the common law in England, which is the common law of Pennsylvania.

2. That the city being in possession of the trust, nothing more is necessary for them, as they want no remedy whether there would be one at common law or not.

3. That such trusts are entitled to protection in equity, upon the general principles of equity jurisdiction, which protects all lawful trusts whether there be a trustee or not.

4. That they in fact enjoyed this protection in chancery before the 43. Eliz. by the original jurisdiction of that court, and have had it ever since.

5. That 43 Eliz. is only an ancillary remedy, long disused in England from its inconvenience, and is supplied by chancery, not as an usurper on the statute, but as the rightful original tribunal for such trusts.

6. That whatever the 43 Eliz. imparted to the law of Charles, except the mere remedy by commission from the lord chancellor, is thoroughly adopted in Pennsylvania, together with the great body of the equity code of that kingdom.

7. That the law in Pennsylvania is the same as the law in all the other states except Virginia and Maryland.

1. Such uses were good at common law.

They can be traced up to an early period, anterior to Richard 2, and the principle upon which they are founded even up to the time of the Conquest. 4 Reeve, 80; Moore, 122. The principle of these charities is also engrafted upon the old English tenures. Co. Lit. 94 b;

Littleton, sect. 132, 136, where provision was made that the soul of the donor should be prayed for. Co. Litt. 96 a.

The tenure was called "frankalmoign." There was another instance where 100 pence were to be distributed to 100 poor men on a certain day. Co. Litt. 96 b; 2 Inst. 456, 406. There were perpetual charities in trust. 6 Co. Rep. 2; Co. Litt. 149 a; Brooke's Abr. part 2, Tenure, 53. Some of the early statutes recognised them.

The stat. 17 Edward 2, chap. 12, passed in 1334, related to the Knights Templars; at the dissolution of the order, the lands were assigned to the Knights of St. John for the same godly uses to which they had been applied, viz.: relieving the poor, &c.

There arose a contest between religious houses and the king about mortmain, and afterwards about superstitious uses. Monastic houses were the conservators of public records and the sources of instruction.

15 Richard 2, chap. 5, was the last of the statutes of mortmain. Chap. 6 allowed spiritual corporations to hold the property of the church and the glebe, subject to making donations for the poor.

Henry 4, chap. 2, allowed the vicar to be endowed, &c.

2 Henry 5, chap. 5, recited that abuses existed in charities and ordered a commission of inquiry to reform them.

23 Henry 8, chap. 7, (see 4 Pickering, 239,) called the statute of mortmain, aimed a blow at these charities. It was passed in 1531, and the king was married to Anna Boleyn in 1532.

27 Henry 8, chap. 25, was the first poor law of England

1 Edward 6, chap. 14, (5 Pickering, 267,) endeavoured to preserve some of the charities from destruction. Boyle, 263, note, refers to this statute, which required commissioners to execute charities for the benefit of the poor. See also stat. 2 Edward 6, (5 Pickering, 299;) stat. 1 and 2 Philip and Mary, chap. 8, (6 Pickering 234.) The monasteries were by this time put down and the charities destroyed.

Then came the statute 39 Elizabeth, chap. 5, from which the Pennsylvania act of 1791 is taken; this statute was continued in force until repealed by 9 George 2. From the circumstance that the charities were put down by the destruction of the monasteries arose the necessity of the 39 and 43 of Elizabeth, which intended to lessen the evil of pauperism by hunting up charities, but which established no new principle in the laws of England. 4 Inst. 66.

2 Gibson's Codex, 1155, where the statute of 39 Elizabeth is

found. This last law is a general one, and covers a larger extent of ground than the 43 Elizabeth, chap. 4. Chapters 2 and 3 show the character of chap. 4. Chap. 2 is a poor-law, and so is chap. 3, for mariners. The 43 Elizabeth enumerates twenty-one charities, but the 39th comprehends all lawful ones. Hospitals were included in the latter but not in the former. The stat. 7 Jac. 1, chap. 3, has for its object to bind out poor boys. In Girard's case the boys must not only be poor, but orphans, a double merit.

There is a dictum of Lord Roslyn in 3 Vesey, jun. 726, in relation to a will being an appointment at common law; but the point decided in that case has nothing to do with the present.

But there is not a single case where the validity of a charitable use has been directly questioned at law; wherever the question came up, it was always incidentally.

The Year-Book of 38 Edward 3 forms the basis of Co. Litt. sect. 383. There was a condition subsequent, which, if violated, gave the heir a right to enter. What was then called a condition is now called a trust. Sugden on Powers, 121; Perkins, 563; Anderson's Rep. 43, 108; 3 Dyer, 255 d, same in Jenkins, 6.

The last case mentioned occurred in the 8 and 9 Elizabeth, and is the Trinity College case. The question was, whether a devise to the college, which was not a spiritual corporation, was good, and it was ruled to be so.

The Skinner's case occurred in 24 and 25 Elizabeth, (Moore, 129,) where the use was to pray for the soul of the donor. So much of the use as was esteemed superstitious was set aside, and the rest confirmed. See also Moore, 594, (or same case in Popham, 6,) where the heir of the executor who had a trust-estate recovered from the heir of the donor.

In Porter's case, 1 Co. Rep. 22, (92), the question was not raised whether a charitable use was good at common law.

We see from these cases what the condition of England was about the time of 34 Elizabeth. The statute 23 Henry 8 did not go into effect for twenty years. Duke, 360; 4 Co. Rep. 116; 8 Co. Rep. 130.

All these cases sustained charities for the poor and were anterior to 39 Elizabeth.

This court has affirmed the validity of charities at common law. A dedication to pious uses is sustainable only upon that ground. 6 Peters, 498, 431; 12 Wheat. 582; 10 Peters, 712; 2 Peters, 256; 9 Cranch, 212; 4 Peters, 487; 4 Serg. and Rawle, 212.

The common law of England is in force in Pennsylvania. In the case of the Bush Hill estate it was ruled that the burden of proof is on him who affirms that any particular part of the common law is not so in force. 9 Serg. and Rawle, 307.

2. The city is in possession, and wants no remedy. If the use is good, the owner of the legal estate cannot recover. 2 Dowl. and Ryland, 523; 5 Maddock, 529, (429.)

But it is said that the use is not good because the proposed college is unchristian. The bill filed in the cause makes no such objection. If zeal for the promotion of religion were the motive of the complainants, it would have been better to have joined with us in asking the state to cut off the obnoxious clause than to use the plea in stealing away the bread of orphans. We are not here to defend Mr. Girard's religious belief, whatever it was. During his life he exhibited his philanthropy at a perilous moment. When the yellow fever burst upon Philadelphia in 1794, almost every one fled, regardless of his property. Girard walked the wards of hospitals, not subdued by the groans of the dying or deterred by the fear of death to himself. All that he had was freely given to alleviate the wretched sufferers. More charitable even than the good Samaritan, he had not only poured oil upon their wounds, but stood by them to the last. The difficulties that surrounded his plan of a college were great. His desire was to include the orphan poor of all sects, Jews as well as Christians, and those who had no religion at all. He might have placed it under the protection of some one religious denomination, but then it would have become a religious establishment, and met with opposition from other quarters. If all sects were to be admitted, what could he do other than what he did? If any clergyman was to be admitted, he would of course teach the doctrines of his own church. No two sects would agree. Some would adopt one part of the Bible, some another. If they agreed as to what was to be left out as apocryphal, they would differ about the translation of the rest. The Protestant would not receive the Douay Bible. See the difficulties that exist in New York about the introduction of the Bible as a school-book. Girard did what was in conformity with law, and often done practically. He had to abandon his scheme or prevent discord by adopting the plan which he followed. The purest principles of morality are to be taught. Where are they found? Whoever searches for them must go to the source from which a Christian man derives his faith—the Bible. It is therefore affirmatively recom

mended, and in such a way as to preserve the sacred rights of conscience. No one can say that Girard was a deist. He has not said a word against Christianity. In the Blucher school in Liverpool there are no preachers. There is no chaplain in the University of Virginia. By excluding preachers, Girard did not mean to reflect upon Christianity. It is true they cannot hold office. But the Constitution of New York excludes clergymen from offices, civil or military. If the situation of a schoolmaster is an office, then a clergyman cannot be a public teacher. Girard only says that laymen must be instructors, and why cannot they teach religion as well as science? Sunday-schools are not prohibited. It is said by the opposite counsel that these poor victims are cast into a prison and shut up for the sake of an experiment. But there is no prohibition against their going out to church—to as many churches as their friends choose to take them to. All that is done by the will is to secure the college from controversy. It is optional with the friends of the orphans whether to permit them to go there or not. Cannot the trustees erect a hospital without the walls where the sick can be sent and have the services of clergymen when necessary? But religion can be taught in the college itself. What, for example, is there to prevent "Paley's Evidences" from being used as a school-book?

The law of Pennsylvania is not infringed.

In the case of Updegraff, (11 Serg. and Rawle, 400,) the court said that Christianity was part of the law. But it was Christianity with liberty of conscience to all men. This is exactly what Girard thought.

By the 3 sect. of the 3 art. of the constitution of Pennsylvania, "all men have a right to worship according to their conscience." If worship were prohibited in the college, (which it is not,) it would not be against law. The constitution says that no man is disqualified who acknowledges the existence of God and believes in a future state of rewards and punishments. Christianity is a part of the law, so that blasphemy can be punished, but not for the purpose of invading the conscience of other persons. But, at all events, the college is not yet built nor the regulation enforced. It is too soon now to set it aside. The city is in possession of the property, and so it must remain. The administration of the charity is a matter for the courts of Pennsylvania exclusively.

3. That such trusts are entitled to protection in equity upon the general principles of equity jurisdiction, which protects all lawful trusts whether there be a trustee or not.

In England the power of the king as *parens patriæ* is delegated to the Court of Chancery. Where there are no trustees or objects of the charity, it is then administered according to the pleasure of the king. See this investigated in Story's Equity, 404. The ancient rule, says Coke, is good; the authority of chancery is plentiful, and the court will not let a trust fail for want of a trustee. Co. Litt. 290, note 1; Co. Litt. 113; Wilmot's Notes, 21—24; 2 Eq. Ca. Abr. 198; 1 Vesey, jun. 475; 2 Story on Equity, 320.

The court did not derive this power from the statute, but from its jurisdiction over trusts. 2 Story, 430; 2 Milne and Keen, 581.

Equity is a part of the law of Pennsylvania, and this is a branch of equity powers. The Supreme Court has the powers of a court of chancery. 1 Dallas, 211, 213, 214; 1 Binney, 217.

In Pennsylvania, specific performance is obtained at law by cautionary verdicts. 3 Serg. and Rawle, 484; Anderson, 392.

4. Such trusts in fact enjoyed protection in chancery before the 43 Elizabeth, by the original jurisdiction of that court, and have had it ever since. Duke, 135, 154, 242, 380, 519, 644; 2 Gibson's Codex, 1158, note 7; 1 Chan. Ca. 157; 2 Levins, 167; 2 P. W. 119; 2 Vernon, 342; 3 Atkyns, 165; 2 Vesey, 327, 425; Wilmot's Notes, 24; 1 Blythe, 312, 334, 342, 346, 347, 357, 358, 67, 61.

There is a dictum of Lord Rosslyn that it did not appear that chancery had such jurisdiction before the statute of Elizabeth; but he has been misreported, or if he said so, he is not sustained by the old authorities. Tothill, 58; Choice Cases in Chancery, 155, in 34th of Elizabeth; Duke, 163.

There was a decree made in 24 of Elizabeth before the statute and upon the judicial power of chancery. It related to a deed of bargain and sale, which was not enrolled and did not pass the land. Duke, 131, 138, 359—361; 1 Milne and Russell, 376.

The book lately published in England by the Record Commissioners, furnishes numerous instances of the exercise of this chancery jurisdiction anterior to the statute of Elizabeth.*

---

* SCHEDULE OF CASES FROM CHANCERY PROCEEDINGS IN TIME OF ELIZABETH.

[Proceedings in Chancery, Vol. I.]

*Record Commission.*

*Babington* v. *Gull, clerk.* Bill complaining that plaintiff's mother had placed 600 marks in the hands of defendant, for the purpose of founding a chantry in the

If this part of the common law be not in force in Pennsylvania, the complainants must prove it. If they think so, why do they not resort to the local courts? It can be shown, however, that Pennsylvania has actually adopted the laws that govern charitable uses.

church of St. Peter of Haworth, in Nottinghamshire, which he had neglected to do.

Answer of William Gull, that he had received the money mentioned in the bill, for the purpose therein; but adding that if the endowment of the chantry were not completed within four years, which are not expired, the money was to be applied in finding three priests to sing daily in the said church; and that he is willing to pay the said money according to the direction of the court.

The prayer is, the plaintiff being without remedy of common law, to issue subpœnas, and to call defendant before him to be examined, and to do and receive according as faith, reason, and good conscience require; and this for the love of God, and in way of charity.

*Wakering v. Bayle.* (Henry VI.) Bill to compel defendant, who is feoffee in trust to make an estate in certain lands in Tottenham and Hornsey, to the hospital of St. Bartholomew, in West Smithfield, for the endowment of a chapel there; "because great multitudes of Christian people of all parts of England and other nations for sickness, poverty, and misery, continually of custom resort to the said hospital, and there relieved; and finally have their Christian sepulture round about the said chapel."

Praying a subpœna, and as in the preceding case, as shall be thought unto your good lordship best, right of conscience to be had and done at the reverence of God, and in way of charity.

Pledges of prosecution. { Rob. Palmer, Wells Balle, } Of London, gentlemen.

*Parker et al. in behalf of themselves et al., the inhabitants of the town of Brentwood, Essex, v. Wistan Browne.* (Eliz. B. 6, 12, 13.) Bill to establish donations. A chapel of ease to the parish church of Southwilde, in which parish the town of Brentwood is situated, and a free school and alms-house there, the said chapel being within the manor of Corbedhall, granted to Sir Anthony Browne, knight, deceased, by letters-patent from Edw. VI.

*Town of Bury St. Edmunds, by Robert Goldeny et al., Governors of Free Grammar School of King Edward VI., in Bury St. Edmunds, v. Goodney et al.* (Eliz.) Bill to quiet possession of lands held by complainants in right of grammar school.

*Buggs et al., feoffees in trust for the parish of Harlon, v. Sompner et al.* (Eliz. B. 6, 17, 18.) Bill to establish charitable uses, in a tenement called the Old Pole, and lands thereto belonging, in Harlon, conveyed and settled tempore Henry VIII. by John Swerder, to feoffees in trust for poor of the said parish of Harlon.

*Bullatt and Purcas, church-wardens, v. Fitche.* (Eliz. B. 6, 18.) Bill for performance of charitable institutions. Land called Church Pightle, held from time immemorial for repairing the parish church of Lyndsell.

*Blenkinsopper v. Aunderson.* (Eliz. B. 6, 19.) Bill to establish a charitable donation. An annuity of £8 for certain paupers and a schoolmaster, in the

To begin with the charter. "The laws for governing property are the same as those of England," 5 Smith, app. 407, sect. 5, 6; Amended Charter, 1701, app. 413; Act of 1718, 1 Smith, 105; Act of 1777, 1 Smith, 429, sect. 2; 1 Dallas, 67, where it is said

parish of Burgh under Stainsmore, devised by Sir Cuthbert Buckle, knight, late Lord Mayor of London, to be charged on his messuage called the Spittle or Stainsmore, and lands thereto belonging.

*Fytch and Godwin, church-wardens, and Wyndell et al., overseers of the parish of Borking,* v. *Robinson et al.* (Eliz. B. 6. 29.) Bill to recover a legacy to charitable uses. The sum of £400 bequeathed by Joan Smyth, widow, to be invested for producing a yearly fund for the relief of the poor of Bocking.

*Thomas Tychmer et al., church-waraens of the parish church of Barrington, and Shevyn Reynolds, the elder, and several others, co-feoffors of lands in trust,* v. *Lancaster.* (Eliz. B. 6, 31.) Bill for injunction in support of a charity. A tenement and lands in Barrington, lately held of the master and fellows of Michael House in Cambridge, as of their manor of Barrington, devised by the will of Thomas Lames to charitable uses for the poor of Barrington.

*George Carlton on behalf of himself et al., inhabitants of Elm,* v. *John Blyth et al.* (Eliz. C. c. 6.) Bill to recover charitable donations. A legacy of £13 13s. 4d. bequeathed by the will of John Allen, deceased, to be invested at interest for the benefit of the poor of the parish of Elm.

*Robert Perot and others, inhabitants and parishioners of the parish of Cornworthy* v. *Stephen Cruse.* (Eliz. C. c. 6.) Bill to appoint new trustees for a charity. A tenement called the church-house in the parish of Cornworthy, conveyed by Sir Pearce Edgecombe, knight, or some of his ancestors, to feoffees in trust for the benefit of the parish of Cornworthy.

*John Irish and others, tenants of the manor of Congresbury,* v. *Thomas Ashe and others.* (Eliz. C. c. 22.) Bill for performance of will for charitable uses. The manor or lordship of Congresbury, and lands in Congresbury and Lawrence Wille, devised by the will of John Carr to the defendants upon sundry trusts.

*The Mayor and Citizens of Chester* v. *Brooke and Offley.* (Eliz. C. c. 23.) Bill to establish a charity.—Legacies left by the will of Robert Offley of London, haberdasher, for the benefit of apprentices and other inhabitants of the city of Chester.

*The Vicar and Church-wardens of the parish of Christ Church within Newgate* v. *The Vicar and Church-wardens of the parish of All Saints, Barking.* (Eliz. C. c. 24.) Claim of donation to charitable uses. A legacy of £4 per annum bequeathed by the will of Jane Watson, and claimed by both these parishes.

*The Mayor, Bailiffs, and Burgesses of Dartmouth* v. *Nicholas Ball.* (Eliz. D. d. 2.) Bill for appointing new trustees for charitable uses. Lands in Clifton Dartmouth Hardness, and in Stokeflemyer, &c., conveyed by Nicholas James to feoffees in trust for the benefit of the poor of said borough, and for repairing the church and harbour.

*The Church-wardens, Parishioners, and Inhabitants of the town and parish of Danburye* v. *Thomas Emery and others.* (Eliz. D. d. 7.) Bill to regulate charitable

C

as the opinion of the court, " that the common law has always been in force." 1 Dallas, 73, 211; 3 Serg. and Rawle, 578, (378;) 1 Binney, 519, (579;) 4 Binney, 77.

The act of 1730 authorizes persons to hold land for charitable donations of land—lands in Burleigh purchased by certain well-disposed persons in trust for the poor of Danbury.

*The Mayor, Bailiffs, and Burgesses of Clifton Dartmouth Hardness* v. *Furseman et al.* (Eliz. D. d. 11.)  Bill for performance of charitable trusts—lands in Clifton Dartmouth Hardness, conveyed by William James to feoffees in trust for the poor of Dartmouth and other charitable purposes.

*Blacknall et al. on behalf of the Inhabitants of Elksley* v. *Spiry et al.* (Eliz. E. e. 4.) To establish a charitable donation.  A parcel of ground in the parish of Elkesley, called Normanton Field, containing 500 acres, which was of ancient time given and conveyed to certain feoffees in trust for the said parish.

*George Carleton, Esq., for himself and the rest of the Inhabitants of the parish of Elm,* v. *John Blythe et al.* (Eliz. E. e. 5.)  For charitable purposes a legacy or sum of £13, 13s. 4d. bequeathed by the will of John Allen, deceased, for the use of the parish of Elm.

*Walter Jenkins et al., tenants and inhabitants of the manor and parish of Fairford,* v. *Oldesworth.* (Eliz. F. f. 3.)  To establish right of copyholders and charitable donation.  The manor of Fairford, late the estate of Roger Lygor, Esq., and Katherine his wife.

*The Mayor, Jurats, and Commonalty of the town of Feversham,* v. *Lady Hannots et al.* (Eliz. F. f. 7.)  To establish a devise to a corporation.  A messuage, garden and lands in Feversham and all other his lands, &c., in the Isle of Hartye, &c., all which after the decease of his said wife, he devised to the said mayor, jurats, and commonalty in fee—for the benefit of the said corporation repairing the harbour and highways thereof.

*Richard Estmond et al., inhabitants of the town of Gillingham,* v. *E. Lawrence.* (Eliz. G. g. 12.)  Bill of revivor to establish certain charitable uses.  Divers messuages, lands, and tenements, parcel of the copyholds of the Queen's manor of Gillingham, which the bill states to have been held time immemorial for the support of a charity-school, and other charitable purposes in Gillingham.

*Goodson et al.* v. *Monday et al.* (Eliz. G. g. 12.)  For performance of a trust for charitable uses.  Divers messuages and lands in Ailesbury, &c., some time the estate of John Bedford, who by a feoffment dated 10th July, 1494, conveyed the same to certain feoffees in trust, among other things for the repair of the highways about Ailesbury and Hartwell.

*Sir Arthur Havenyngham and other inhabitants of Havenyngham* v. *Th. Tye et al.* (Eliz. H. h. 1.)  To obtain attornment and rent for charitable purposes.  Fifty acres of land, meadow and pasture, called the town land of Havenyngham, lying in Badyngham, in the occupation of defendant Tye, the reversion being in feoffees for the use of said town.

*Thomas Sayer et al., overseers of the poor of Hallingbury Morley,* v. *Lambe et al.* (Eliz. H. h. 2.)  To establish a charitable donation.  A sum of £20 given by the will

uses. This is said to be an enabling act: but it is upon a different principle from the English statutes which are intended to aid, in some measure, a religion not fully tolerated by law. But in Pennsylvania there is universal toleration, and all sects stand upon equal

of Thomas Lambe, deceased, to be for the perpetual benefit of the poor of Hallingbury parish, and which the bill prays may be laid out in the purchase of land for that purpose.

[Proceedings in Chancery, Vol. II.]

*Lyon and wife* v. *Hewe and Kemp.* (Temp. Edw. IV.) This is a bill, answer, and replication. The complaint being that the defendants had disposed of property, left for religious and charitable purposes contrary to the will of the plaintiff, Ellen's late husband.

*Huckmore* v. *Lang*—to recover title deeds for charitable uses.

*Buggs et al., inhabitants of parish of Harton,* v. *Sebley.* For establishing charitable donations. A copyhold tenement which was surrendered by one John Godralf to the use of the poor of the said parish.

*Sayer and Pryor, overseers of poor of parish of Morley,* v. *Lambe et al.* To recover charitable donation. £20 bequeathed by the will of Thomas Lambe to the inhabitants of the town of Hallingbury Morley—the income thereof to be for ever applied to the use of the poor of the said town.

*Heron and Browne, Ex'rs of Freston* v. *Sproxton et al.* (Eliz.) For performance of a will respecting charitable donations. Divers messuages, lands, and tenements in Altoffts, &c., &c., late the estate of John Freston—who by his will gave large sums of money for building and endowing an almshouse in Kirkethorpe, and a free-school in Normanton, repairing highways and other purposes.

*Fisher for himself and other the inhabitants of the town of Irchester* v. *Bletsoo.* In support of a charitable donation. Divers messuages, lands, &c., in Irchester, &c., which in time of King Henry VII. were given and granted by Will. Taylor and John Lely to trustees for the use of the poor of Irchester, and repair of the bridges there.

*Stock et al. on behalf of the poor of Icklingham* v. *Page et al.* For performance of a charity. A capital messuage called the Town-house with fourscore acres of land and a sheepwalk in Icklingham, settled from ancient time in feoffees for the use of the poor of said town.

*W. Fisher, master of the Hospital of St. Mary of Ilford* v. *Anne Seward, widow.* (Eliz.) Bill of revivor to recover dues of a charity. Titles of demesne lands of the farm of Eastbury and the tithes of, &c., settled for the relief of poor persons in the hospital of Ilford.

*Th. Foxe, for himself and other the inhabitants of the parish of Kybworth,* v. *Benbe et al.* (Eliz.) For the support of a charity. Nine messuages and six cottages and six yards land in the towns, fields, and parish of Kybworth, &c., given for the support of a schoolmaster and grammar-school at Kybworth.

*Z. Babington, master or warden of St. John Baptist in the city of Litchfield* v. *Sale et al.* (Eliz.) For the support of a charity. A capital messuage and divers

ground. In England, the mass is held to be superstitious. Boyle, 242.

The statute 23 Henry 8, a mortmain act, avoided deeds " for superstitious uses." But what were deemed to be so in England, are

other houses and 100 acres of land in Litchfield, &c., held for the support of poor persons in the said hospital, and also of a free grammar-school.

*The Mayor and Burgesses of Kings Lynn* v. *Howes, clerk.* (Eliz.) For performance of a charitable donation. John Titley, Esq., by his will gave a payment, charged upon his dwelling-house at Lynn, for the maintenance of a preacher there, and other charitable purposes.

*R. Newton, clerk, and the Church-warden and inhabitants of the parish of Little Monden* v. *Dane.* (Eliz.) To establish a charitable donation. A messuage, &c., devised by the will of Rafe Fordam to defendant, for certain charitable purposes stated in the bill.

*Rycardes, Moore, and King, for themselves and the rest of the Inhabitants of Rodborough* v. *Payne et al.* (Eliz.) To protect a charitable donation. Certain lands, &c., in Rodborough, &c., which in the time of King Henry VI. were given by Margery Breyseyn and others to the church-wardens and inhabitants of Rodborough, for the performance of divine service in chapel of ease to said parish, but which defendants claim as having been forfeited to the crown, being given for superstitious uses.

### [Proceedings in Chancery, Vol. III.]

*Spenser et al., trustees,* v. *Grant and wife Joan.* (Eliz.) Claim to a rent charge given in trust to plaintiff for charitable purposes. Agnes Chepsey of Nottingham, demised unto Coles and Joan his wife, divers messuages, &c., at a certain rent, which she afterwards demised to the plaintiffs in trust to pay into the hands of the chamberlain of Northampton, for and towards two-fifteenths of the said town; which rent, after the decease of the said Agnes, the defendant Joan and her then husband, the other defendant, refused to pay to plaintiffs.

*Smith and Willis, church-wardens of St. Aldatis, Oxford, on behalf of the parish,* v. *Smith Ald. and Furney's feoffees.* Against defendants as feoffees in trust to perform and carry into effect such trusts to charitable uses. Edgecombe being seised of certain houses, &c., in city of Oxford, conveyed the same to certain feoffees in trust; who, from the profits thereof were to repair the church, to relieve the poor, and for other good and charitable purposes. They conveyed the same to new feoffees, of whom the defendants are survivors, and refuse to account.

*The Inhabitants of Thirplangton* v. *Jarvis, only surviving feoffee.* To compel performance of trusts in a deed of feoffment for charitable uses, and to convey to other trustees, a house on Thirplangton and tenements in East Langton, &c.

*Turney and Roberts* v. *Buckmasters.* To protect the plaintiffs in the execution of the will of Thomas Knighton for charitable uses. Lands lying within manor of Leighton Bussard. The defendants allege the same to have been left to superstitious uses, and endeavoured to get the same into their own hands.

*The Master and Brethren of the Hospital of Robert, Earl of Leicester, in Warwick,*

not held to be so in Pennsylvania. So a statute of Henry 8, prohibited gifts to Catholics.

In 1548, 2 and 3 Edward 6, chap. 1, the act of uniformity establishing the church, directed all ministers to observe the mode

---

v. *Lee et al.* (1600.) For payment of an annuity of £20 given to a charity. Robert, late Earl of Leicester, being seised in fee of an annuity of £20, issuing out of a farm called, &c., the inheritance of defendant Ogden, by deed gave the same to the said hospital.

*Henry Hall and John Hall, on behalf of themselves and others, the freeholders and inhabitants of Witham, Essex,* v. *Panke.* (39 Eliz.) For the support and continuance of a charity. By the gift and grant of well disposed persons, divers lands and tenements in Witham, and also divers sums of money, were given for the reparation of the church, the relief of the poor, and other charitable purposes ; which lands were settled in feoffees ; and the defendant having got possession thereof, and moneys, and the deeds of settlement, refuses to perform said trusts, or to appoint new feoffees in the names of those dead.

*John Lloyd, D. D., vicar, Thomas Baker, and Richard Wilborn, church-wardens, and poor of Writtle,* v. *John Aware et al., surviving feoffees in trust for said parish.* (1596, 38 Eliz.) For the continuance of a charity. A messuage and land called Hookes in the parish of Writtle, which in the year 1500 was given by Thomas Hawkins to feoffees in trust for the poor of the said parish.

*R. Wyllet and Thomas Sudbury, church-wardens and inhabitants of the town of Middleton,* v. *Agnes Middleton, widow.* (13 Eliz.) To recover a charitable pension. A yearly rent of 6s. 8d. payable to the parish of Middleton, charged upon a messuage and land in Middleton.

*John Whitehurst and Thomas Amery, for themselves and other inhabitants and parishioners of the parish of Dulerne in the county of Stafford,* v. *George Warner.* (1573, 15 Eliz.) For support of a charity. Robert Warner, deceased, and others, inhabitants of the said parish, having a sum of money to invest for the erecting of a grammar-school and providing a schoolmaster, purchased therewith certain lands in Kenwalmerche, &c., in Devonshire, and applied the rents and profits according to the trust ; which lands afterwards became vested in defendant as surviving feoffee, who had received other money to purchase a messuage and land in Fradley in the county of Stafford, which he neglected to do.

*George Warner* v. *Whitehurst et al.* (20 Eliz.) Cross bill setting forth the bill. A decree and an award had been made by the several contending parties ; and for carrying the said award into execution, and to protect the plaintiff against his arbitration bond signed by him, this proceeding is instituted.

*Fisher et al., inhabitants of Warwick,* v. *Robert Philipps and Thomas Cawdrey.* (1574, 15 Eliz.) For the recovery of sundry bequests of money left by will of Thomas Okery, deceased, to be applied to charitable uses in the town of Warwick.

*John Rawley et al., inhabitants of the parish of Wilborough,* v. *Lewis et al.* To appoint new trustees of a charity. Lands and tenements in parish of Wilborough, containing 120 acres, of which the defendants were surviving feoffees in trust for repairing the parish church.

therein pointed out.    The Book of Common Prayer was thus legalized.

1 Mary, session 2, chap. 2, repealed the above.

1 Elizabeth, chap. 2, re-established the act of Edward, and extended to the people the mandate to use the Book of Common Prayer.
This was again repealed in the time of the Commonwealth.

The 13 and 14 Charles 2, chap. 14, was another uniformity act; and this was the state of the laws relating to religion when the charter of Pennsylvania was granted in March, 1681.

Gifts to Catholic congregations were void. · Moore, 784, cited in Boyle, 265; 1 Salk. 162; 1 Eq. Ca. Abr. 96.

When the statutes of conformity were in force all gifts contrary to them were void; and this is the origin of the doctrine of *cy-pres.* 2 Vernon, 266.

· In 1688, 1 W. and M. chap. 18, toleration was extended to all who would sign the thirty-nine articles with some exceptions. This act is all that now supports a use in favour of dissenters.    2 Vesey, 273, 275; 2 Eq. Ca. Abr. 193; 3 P. W. 144, 344; 1 Vesey, 225; 3 Merivale, 409.    See also 11 W. and Mary, chap. 4, sec. 3, in which the toleration act is extended to the colonies.

There is not a word in the charter respecting toleration of any religion.    Sect. 22 protects the church of England by saying that preachers sent by the Bishop of London may reside in the province.

The stat. 5 Anne, chap. 5, sect. 8, in 1706 secured the rights of the Church of England, as established in that country and the territories thereunto belonging.    From the commencement of the reign of Anne to 1712 various disputes occurred· between the colonists and the crown and governor respecting recognition of affirmation; the right was asserted by the legislature for the third time in 1710. Wise and Brockden, app. 2, p. 43, 46, 50; 1 Votes of Assembly, part 2, p. 130; Proceedings of Council, 517.

In 1712, the act of Assembly was passed permitting religious societies to purchase ground, &c., and declaring that gifts should go according to the intentions of the donors.    The Assembly remembered Baxter's case, and intended to prohibit the doctrine of *cy-pres.* Whether dissenters were tolerated was discussed till 1755.    Smith's History of New York, chap. 4, p. 213, 255, 257

By the 8 George 1, chap. 6, Quakers were allowed to affirm. Various occurrences took place between 1719 and 1730 when the act of that year was passed, narrowing the ground of prior acts.    In

1730, in the case of Christ Church, an opinion was given by counsel recognising the law of charitable uses.

In Remington v. The Methodist Church, this act was construed and a trust for the general Methodist Church held not to be good, because it was not for the benefit of citizens of Pennsylvania.

In 1776, the first constitution of Pennsylvania, (Smith, 430,) brought charitable uses under the protection of the fundamental law. Sect. 45 says all religious societies and bodies of men for advancement of learning or good and pious uses shall be encouraged and protected in their property, &c. · No act of incorporation was necessary, because it says, " united or incorporated" for " learning" as well as " religion." The people had been struggling for seventy-six years to obtain from the crown the privilege of holding ground for churches. It was a part of their love of freedom. And now we are told that they have no rights except under the act of 1730.

The legislature made no corporation for any purpose whatever until 1768. ·1 Smith, ·279.

The proprietary incorporated churches, because it was said they had lost legacies; and this was the apology to the crown for going against the English policy. There was only one attempt to destroy a charitable use before the Revolution. In 1769 a will gave a legacy to an hospital and the poor, to two corporations, Christ Church and St. Peter's. The heir brought an ejectment in 1776, and the church took the opinions of Wilcox and Wilson, both of whom affirmed that the bequest was good at law. In 1779, the cause was ended without a decision of the question. These corporations were established in 1765 and became trustees for others. · The property held is now of great value, and the trust is still kept up without any mismanagement.

After the act of 1730, the governor said in 1734 that there was a Catholic church in Philadelphia where mass was said contrary to law; but the Assembly replied, that in the colony there was a toleration of all religions, and there the matter ended. Worship is held there now.

The city of Philadelphia still holds and administers Franklin's legacy; and so of those of Kirkpatrick, Blakeley, Scott and Goudenot. There are two other legacies, and the Freemason's Lodge gave a sum of money, all of which are now administered. There is a separate book, called " Devises and Grants."

Are all these to be broken up?

The spirit of the statute of Elizabeth is extended to Ireland. 4 Dana's Abr. 5, 6; Shelford, 60.

They are also in Pennsylvania as part of the common law; bequests for pious uses are made by all descriptions of persons, no matter how uncertain the objects of the charity may be. The Quakers have held their schools through trustees, and never been incorporated since the settlement of the colony. See 3 Watts, 440.

See 5 Watts, 493, where a trust for a school was said to be "vague and uncertain;" but the court said not, "for the neighbours got the benefit of it." Charity-schools have been favourites in the state, sustained by usage, without any reference to the statute of Elizabeth.

Manuscript case of Zimmerman decided in the Supreme Court of Pennsylvania, on 6th January, 1844, where there was a bequest to an unincorporated society for the benefit of poor orphans, and the court said it was good under the constitution, although the statute of 43 Elizabeth is not in force.

7. The American cases are as follows: 12 Mass. Rep. 537, 546; 9 Cranch, 292, 43; 9 Cowen, 427, 437; 2 Peters, 566; 3 Peters, 501; 3 Shotwell, 9; 3 Paige, 300; 16 Pickering, 107; 6 Paige, 640; 7 Paige, 77; 7 Vermont Rep. 241; 4 Dana, 354; 3 Edwards, 79; 1 Voss, 96; 20 Wendell, 119; 24 Pickering, 146; 1 Hoffman, 202.

The Virginia and Maryland cases are not cited because they followed the rule laid down by this court in the case of the Baptist Association.

*Sergeant,* on the same side.

The condition of the law in England and Pennsylvania has been well examined. Lord Roslyn has said that chancery did not take cognisance of charitable uses before the statute of Elizabeth, but Lords Redesdale and Eldon say otherwise. Roslyn is known to us as the insulter of Dr. Franklin, and now the same great people whom he represented, are harrassed because this same Lord Roslyn doubted almost the statute of Elizabeth. When the rubbish of three centuries is swept away and the old records of England brought to light and published, there is evidence enough that the law of charities before the time of Elizabeth was the same that it is now in Pennsylvania. But the counsel on the other side complain that they cannot understand the law of Pennsylvania. It is not necessary that they should; for all that is asked by us is, that she may be suffered to

enjoy the contributions of her own wise and good, accumulating from the time that the first white man came there to settle with the Bible in his hand. Girard came there after the constitution of 1776 and before that of 1791 ; he lived in an atmosphere of charities in Philadelphia ; he saw Franklin's charity established and upheld by law, administered by the city, and never heard its validity questioned. No tribunal in the state was ever asked or would be permitted to question Franklin's charity. Girard knew where to find the best legal advice, and undoubtedly had it. In Pennsylvania no argument would be listened to, such as we have heard here. We are invited to explain the law by those who do not want to understand it. It has been said by the other side, that no law can be considered as settled which has not been mooted ; that is, that if all the courts, for an indefinite period, decide in the same way, it is of no account unless some ingenious and subtle mind calls the law into question. In one case, this court waited for the state court in Ohio to expound its laws, and then followed the decision. In another case, the court in Tennessee construed its laws ; this court adopted it. The court in Tennessee reversed its decision ; this court did so too. The present is a question of Pennsylvania law, and we have heard the last decision of its highest state court in January, 1844, read from the manuscript report. This concurs with all previous decisions ; and yet the counsel on the other side say that they want a fixed system of law. Virginia and Maryland are the only two states where the law is otherwise, and they followed what they understood to be the decision of this court in the case of the Baptist Association. The question is not whether the Pennsylvania law is right or wrong, for we do not wish to impose it upon any one else. But the only question is, what does the law of Pennsylvania say upon the point. Girard's will was made by the advice of the best counsel that could be found ; it was proved as soon as he died ; the executors went on to perform their trust, in presence of the proper courts and with universal consent ; they paid large sums over to the city. The claimants then brought an ejectment, and exhibited this will to the Supreme Court of Pennsylvania, who found no objection to it. The city of Philadelphia brought a suit under it for some property ; no judge nor counsel ever hinted that the will was void. Five years passed. The legislature had passed a law immediately recognising the will as existing and valid in all its parts. The preamble does so. In the case of the Town of Pawlet, Mr. Justice Story says, "the crown

has recognised the existence of the town." Does the recognition of this will by the legislature go for nothing? The capacity of performing certain acts is admitted by the legislature, and is this not as effectual as a recognition by the crown? Ten charities are going on now in Philadelphia. Custom and usage make the common law of England. Why has not Pennsylvania a right to enjoy her common law, not imported in parcels and packages from England, but modified and altered by circumstances and made suitable to the people.

If we are not strong enough to stand alone, we might ask support from the other states whose law is the same with ours. Where did the doctrine of charities spring from? and from what quarter did it enter into the heart of man? We are authorized to denounce as an infidel or worse, the man who hath not charity in his heart. As surely as the pilgrims acknowledged a higher power, so surely did they recognise the obligation to take care of their fellow-creatures. The people of the state are now a hospitable and charitable people, and wo be to him who endeavours to intercept the flow of the current. Where money is given to the poor, is any one at liberty to take it? Thou shalt not steal. This is property under the protection of the court, and the right to it as sacred as that of any man to the enjoyment of his own. The voice of Pennsylvania is accordant and unbroken. We are called upon to examine what the chancellor did before the 43 of Elizabeth, three centuries ago; but this does not concern us. It is now settled even there, that no charity shall fail; if it is indefinite, the king shall administer it. Whether there are trustees or not, whether there be a corporation or not, all take. This charity would be safe in England; and yet it is said we must lose it unless we can show how matters were conducted three hundred years ago. This is a heavy burden to lay on a charity. In Pennsylvania, as in England, the law of charity established itself. No man can say when it began; it has always existed as far as we know. What is the common law of England? Leaving out its being the perfection of reason, it is such an application of rules as will promote the welfare of society. The law of charity has existed in England for sixteen hundred years, some centuries before Alfred. Before Penn came over, there was a settlement of Swedes near Philadelphia, at Weccacoe, a brave and moral people. They built a place of worship, and about 1700 a better one which remains to this day. The charter of that church bears date in 1765, but the first church was built in 1677. Where was the law of charities for these hun-

dred years? and what protected the graves around the church all this time? The same law that exists still. Christ Church was seventy years without a charter. In Walnut street there was a chapel abhorrent to English law, where mass was said. It stood until it was taken down and replaced by a larger one. Who ever offered to take away this church? What is the condition of the Philadelphia Library with its 50,000 volumes? It has always acted without a charter. Story supposes that the rudiments of this law of charities came from the civil law. Thurlow and Eldon thought so too. In 1138, the civil law came into England, and the canon law soon afterwards, and is part of the law of that country to this day. But how did it get into the civil law? It is said from Constantine. But wherever Christianity went, charity went too. Gibbon says " the apostate Julian complained that Christians not only relieved their own poor, but those of the heathen also." The revealed law is part of the law of England. Blackstone says so. When did Christianity come into England? It reached Rome in the time of the apostles, where Paul and Peter both suffered. But when England? Some say at the same time that it was carried to Rome, and was there trodden down for a time. The latest period is 597, the arrival of Augustine. An archbishop of Canterbury was then appointed, and there has been one ever since. If Christianity carried the law of charity to Rome, it must have done so to England too. It was a part of the common law after the sixth century. Where is there a spot upon earth, where Christianity is found, that the law of charity does not exist also? Alfred sent an embassy to the Christian churches in Syria, in the ninth century, and had the ten commandments translated into Saxon. From one great source have flowed two sorts of charities, one religious, the other more general. The only difficulty that ever existed in Pennsylvania related to the first class—religious charities. In the 14th century lived Wickliffe, called the day-star of the Reformation; a man confounded with turbulent men, but a professor of divinity and singularly learned. It was an object in that day to save England from paying tribute to the pope. From that time a religious struggle ensued. Henry 8 found the Roman Catholic religion firmly established, the revealed law being part of the law of England. All parties admitted this. From the time of Augustine down, the common law had been undergoing changes to suit the spirit of the age, but the revealed law was a part of it all the time. Tothill, 126, quoted by Judge Baldwin in McGill and Brown. To this same

great source we owe the idea of a paternal power in the state—a *parens patriæ*—not the king, nor the chancellor, but a power exist- ing somewhere to take care of the sick, the widow, and the orphan. Take this away and we become a nation of savages. If there is no protection for the infant and the aged, the charm of civilization is lost. In Pennsylvania all this is cared for; by hospitals and houses of refuge. No power is able to stop the flow of charity, because there is liberty of conscience. The same law that enjoins upon a witness in court to tell the truth, instructs him to give to the poor. One is not less binding than the other. All that is asked of govern- ment is, that under the protection of law, the great duty of charity may be fulfilled; and it is proposed now to say to every one that he shall not do so; that his gift shall be forfeited. The law of charita- ble uses furnishes this protection. In the 17 Edward 2, in 1324, the Knights Hospitallers were made new trustees of a charity when the Templars were dissolved. Story (Equity, 403, 412) says, that chari- ties are liberally construed, and in 415, "if the bequest be for charity, no matter how uncertain the beneficiaries may be, a court will sus- tain the legacy." See also 3 Peters, 484; 4 Wheat. 41; 7 Vermont Rep. 289.

A bequest is not void for uncertainty of persons. 7 Cranch, 45; 2 Story, 206; 6 Peters, 436, 437; 2 Peters, 256.

The law of charities existed in England prior to the time of Eliza- beth. 2 Russell, 407.

The opinion given by Judge Baldwin in the case of McGill and Brown, embraces all the law of Pennsylvania. The law of this court is not different. The two cases cited in the decision of the Baptist Association appear now to be reported differently in five different books, and this court afterwards said that a dedication to pious uses should be protected. The case of the Baptist Society is reported in 3 Peters. If the counsel on the other side construe this case rightly, then all charitable uses are swept away; but how then did it happen that Chief Justice Marshall afterwards said that eleemosynary corpo- rations are to be encouraged. There cannot be a right without a full remedy; and if a man has a right to give, his donation must be protected.

The constitution of 1776, sect. 46, says, "all religious or chari- table societies ought to be encouraged and protected." What does the 43 Elizabeth do? It directs charities to be looked up, amounting to twenty-one. Is not the fundamental law of a state of as much potency

as a British statute? The latter only looks to the past; the former to the future. The statute only includes twenty-one; the constitution takes in all. It says " other pious and charitable purposes." These words must be understood in their appropriate sense, according to their meaning in England at that time. It is of higher authority than the British statute, because it prohibited the legislature from doing any thing contrary to the principle which it established. The constitution is a great land-mark; no one can dispute its authority without treating the people of Pennsylvania with disrespect. In Beatty and Kirk, (580,) the court say " the bill of rights of Maryland recognises the statute of Elizabeth to some extent." Why is not a recognition to the full extent by Pennsylvania equally valid? Pennsylvania even adopts " superstitious uses," as they are called in England. Her settlers were of every shade of opinion.

The monasteries in England were seized upon by Henry 8, but the rapacity of his favourites was even greater than his own. England presents now a great contrast of rich and poor. Some of the largest fortunes are owing to the benefactions of this king, such as that held by the family of Russel. The owner of the " poor flat, Bedford level," complained that Burke received £300 a year. Religious supremacy was established in the king. He laid down six articles, containing the points in dispute between himself and Rome. Who can tell what was then held to be " a superstitious use?" At the end of the Reformation, it was punishable to believe what the statute of 31 Henry 8 ordered. The test of " superstitious uses" was constantly changing down to the time of Charles 2; the Presbyterians, Independents, &c., when uppermost, all trying to compel conformity. Then our ancestors came, abhorring religious supremacy, bringing with them liberty of conscience, and the whole law of religious charities. They asked the crown to give them religious endowments, but not charities, and were at last compelled to take the act of 1730. Churches of all sects had been built, even Roman Catholic. In Magill and Brown, page 55, note, Judge Baldwin mentions forty-six charities, none of which were religious. The statutes 23 Henry 8, chap. 19, and 13 Elizabeth, chap. 1, make decrees of synods a part of the law of the land.

The Pennsylvania act of 1791, (Purdon's Digest, p. 181,) recites that any persons who mean to associate for the purposes of charity, may be incorporated with the approbation of the attorney-general.

There never has happened a case where the property of any religious society, Jew or Catholic, was seized upon.

There are two objections made to the validity of the devise.

1. That the proposed system of education is unchristian.

2. That the beneficiaries are too uncertain.

As to the first, all conscientious scruples, honestly entertained, are entitled to great respect. If any man who has charge of an orphan boy is afraid to send him to the college, he may keep him away without censure. It is merely an invitation to come. The constitution of Pennsylvania respects all scruples of conscience, and if children were to be dragged in and kept by force, it would be a violation of its principles. But the will in effect says "obey conscience and yield it to nobody." This scruple is of recent origin. It is not alleged in the bill. Perhaps the complainants felt no scruples then, but do now. If they slumbered so long, they ought to have some charity for Mr. Girard, in whose breast they never awaked. But a great prize is now to be reached, and the judgment may be affected by the will. Two things must be made out to overthrow the devise upon this ground

1. That it is a superstitious use.

2. That it is inseparable from the trust.

The question is more suitable to a theological board than a court of justice. That the law of charity is the law of the land, is not a proposition depending upon theological inquiry. In Baxter's case, the court was not called upon to say which party was right, but only to decide what it was that the statute said; and because Baxter was a non-conformist, the trust was declared void. What could a Pennsylvania judge have done in such a case? He would find liberty of conscience established by the constitution; that in the constitution of the United States it is provided that Congress shall make no law affecting religion; and that Mr. Madison once affixed his veto to a bill incorporating a church under an apprehension that it trenched upon this delicate ground. It never was held that a charitable devise must make provision for religious education. In the list of forty-six before cited, thirty-seven are for mere charity. Does any one desire that the old times in religion should return, when a man was allowed to do good only in a particular way, and in no other? What was the spirit that led to burning the convent near Boston? Precisely this. Religious acrimony now destroys property, if it does not doom to the stake.

We have nothing to do with Mr. Girard's religious opinions. If any one thinks he can lead a better life, with equal humility and more zeal, let him try. Instead of there being any thing against religion in the will, there is a manly and unaffected testimony in its favour. The boys are directed to " adopt such religious tenets as mature reason may prefer ;" any tenet, without exception. The will then holds religion to be inseparable from human character, but thinks the best way of forming that portion of the character is by attending to it at mature age. It is a speculative question. Can it be said that Girard had no respect for religion? He showed a religious heart by bestowing upon the poor what God had given him, so that, like Franklin's legacy, " it might go round." His desire was that the children should be educated in the manner which he thought the best, to make them religious. Who is to decide whether it is the best way or not? The objection assumes that the Bible is not to be taught at all, or that laymen are incapable of teaching it. There is not the least evidence of an intention to prohibit it from being taught. On the contrary, there is an obligation to teach what the Bible alone can teach, viz. a pure system of morality.

Is it true that ministers alone can teach religion? The officer at the head of the institution (Professor Bache) is a religious man. Can he not expound religion as well as science to his pupils? The laymen are the support, at last, of all churches. The next position will be that clergymen are responsible for every thing, and that a man can do nothing for himself. Every one has to teach his own children. Why can he not equally instruct those of other people? The orphans are not to enter the college until a contract is made for them by somebody. According to the common law, an infant can bind himself so some extent by a contract. So he can here. It must be sanctioned by his guardians too. No one objects to a child being bound out in a vessel where, of course, there is a great chance of his dying without the benefit of religious services, and where his voice, when in extremes, cannot reach an ear which, it is said, it ought to do. We must, upon this doctrine, condemn the House of Refuge. But we may trust that the cry of a child will be heard in mercy, although it may not reach the ear of a priest. If a father should refuse to instruct his children in religion, can the state interpose? Suppose that the will had made no provision on the subject, and the governors of the college had adopted this same regulation, would the court have denounced it as a violation of their duty?

The case of the University of Virginia is far beyond this. There is no professor of theology, nor instruction in divinity. These things are purposely omitted, from a fear that the institution might become sectarian. If Virginia permits it, she is the judge of its propriety and not we. But Girard has neither prohibited religious instruction nor a professorship. What will the United States do with the Smithsonian legacy? Congress cannot connect religion with it. Clothing and feeding the poor are worthy objects. Girard is said to have expressed himself in terms derogatory to Christianity. Suppose he had used a different phraseology, and said that none but laymen should be admitted into the college. This would not have been objectionable, and yet precisely the same result have been brought about. Children are to be fed and clothed. This is not a superstitious use, and must stand. Will you destroy the patient, if there is an unsound limb? The case is left with the court with a perfect conviction that it will not put the knife to the throat of this most useful charity.

*Webster*, for the appellants, in reply.

The complainants in this cause are the next of kin to Stephen Girard, who come here to try the validity of a devise, purporting to establish what has been called a charity. The counsel on the opposite side have assailed their motives, accusing them of wishing to steal the bread of the orphan, and have censured them for coming to this court instead of resorting to the tribunals of Pennsylvania. The plaintiffs are foreigners, and have a right to come here under the Constitution of the United States. Are they to be reproached for it? But the answer to this objection has already been furnished by the opposite counsel, when they say that in Pennsylvania, the complainants would not have been permitted to question the devise. Here, they are sure of a patient hearing. The cause was not argued in the Circuit Court, because the question arose in that court in 1833, upon the construction of the will of Sarah Zane,* and the court, in its opinion, decided the point. It would, therefore, have been useless to renew the argument there, but the best way was to bring the subject directly up for review.

It was said by the opening counsel, (Mr. *Jones*,) that in England charities are often superintended by the king in virtue of his prerogative, and that no analogous power can exist in a republican govern-

---

* See Appendix.

ment, where there can be no *parens patriæ*; and it was also said that in order to establish a peculiar and local common law in Pennsylvania, one decision is not enough, but there must be a series of decisions to sustain a system of law. Both these positions are correct.

But the attention of the court will be directed in the first place to that clause in the will which excludes clergymen, &c.; from the college; and it is worthy of reflection whether the devise must not be maintained, if maintained at all, upon the ground of its being a charitable devise, and as such entitled to special favour. It is a proposition of the highest magnitude, whether in the eye of jurisprudence it is any charity at all; the affirmative cannot be supported by law, or reasoning, or decisions. There are two objections to it.

1. The plan of education is derogatory to the Christian religion, tending to weaken men's respect for it and their conviction of its importance. It subverts the only foundation of public morals, and therefore it is mischievous and not desirable.

2. It is contrary to the public law and policy of Pennsylvania.

The clause is pointedly opprobrious to the whole clergy; it brands them all without distinction of sect. Their very presence is supposed to be mischievous. If a preacher happens to have a sick relative in the college, he is forbidden to visit him. How have the great body of preachers deserved to be denied even the ordinary rites of hospitality? In no country in the world is there a body of men who have done so much good as the preachers of the United States; they derive no aid from government, constitute no hierarchy, but live by the voluntary contributions of those to whom they preach. It astonishes the old world that we can get on in this way. We have done something in law and politics towards our contribution for the benefit of mankind; but nothing so important to the human race as by establishing the great truth that the clergy can live by voluntary support. And yet they are all shut out from this college. Was there ever an instance before, where, in any Christian country, the whole body of the clergy were denounced? The opposite counsel have gone as far back as Constantine in their history of charities; but have they found or can they find a single case, where opprobrium is fixed upon the whole clergy? We have nothing to do with Girard's private character, which has been extolled for benevolence. Be it so. We are asked if he cannot dispose of his property. But the law cannot be altered to suit Girard. What is charity? It is the indulgence of kind affections—love—sympathy for our fellow-creatures. In a narrow sense

it means alms, relief to the poor. But the question is, what is it in a legal sense? The object here is to establish a school of learning and shelter; to give a better education. The counsel upon the other side are right in speaking of charity as an emanation of Christianity. But if this be so, there can be no charity where the authority of God is derided and his word rejected. If it becomes an unbeliever, it is no longer charity. There is no example in the books of a charity where Christianity is excluded. There may be a charity for a school without a positive provision for Christian teachers; but where they are expressly excluded, it cannot be such a charity as is entitled to the special favour and protection of a court. It is said by the counsel on the other side that Pennsylvania is not an infidel state, but a Christian community; and yet children who are orphans, with no parents to look after them, are directed to be shut in to stay until they approach manhood, during the age when the character is formed, and if they happen to have any connections or friends who are clergymen, they are excluded from ever seeing them. There are two objectionable features in this restriction in the will. The first is, that all clergymen are excluded from the college; and the second, that a cruel experiment is to be made upon these orphans, to ascertain whether they cannot be brought up without religion.

[Mr. *Webster* here read a passage from one of the works of the late Bishop White upon this point.]

The doors of the college are open to infidels. The clause, as it stands, is as derogatory to Christianity as if provision had been made for lectures against it. If it be said that infidels will not be encouraged, the answer is, that a court can only judge of the tendency of measures. The trustees must not be supposed to violate the will. But it is said by the counsel that lay teaching can be substituted for clerical. There are at least four religious sects which do not allow this mode of teaching religion; and it is as much against the spirit of the will as teaching by clergymen. The object is to have no religious teaching at all, because in this way controversy will be avoided. Lawyers are as much sectarians as clergymen, and lay teaching leads as directly to controversy as lay preaching. The intention of the will is, that the boys shall choose their own religion when they grow up. The idea was drawn from Paine's Age of Reason, 211, where it is said "let us propagate morality unfettered by superstition." Girard had no secrets, and therefore used the

words which he considered synonymous with "superstition," viz.: "religious tenets."

Ministers are the usual and appointed agents of Christ. In human affairs, where the ordinary means of attaining an object are rejected, the object is understood to be rejected also; much more is this the case when the means are of divine authority. In the New Testament preaching is ordered both before and after the crucifixion. "If any man refuse to hear," &c. "Go ye into all the world and preach the gospel to every creature." Different sects have different forms of worship, but all agree that preaching is indispensable. These appointed agencies have been the means of converting all that part of the world which is now Christian. What country was ever Christianized by lay teaching? By what sect was religious instruction ever struck out of education? None. Both in the Old and New Testaments its importance is recognised. In the Old it is said "Thou shalt diligently teach them to thy children," and in the New, "Suffer little children to come unto me and forbid them not." But this will requires religion to be put off till mature years, as if a knowledge of man's duty and destiny was not the earliest thing to be learned. Man is the only sentient being who knows that he is eternal; the question "If a man dies, shall he live again?" can be solved by religion alone.

Is this school a charity? What is to become of the Sabbath. It is not intended to say that this institution stands upon the same authority as preaching, but still it is a part of Christianity. All sects have a day which is holy, and hold its observance to be important. Lay teachers will not do. Where are the children to go to church, even if they go out of the college? There is no Christian father or mother who would not rather trust their children to the charity of the world at large, than provide in this way, for their bodily comforts. The single example of the widow's mite, read as it has been to hundreds of millions of people, has done more good than a hundred marble palaces. No fault can be found with Girard for wishing a marble college to bear his name for ever, but it is not valuable unless it has a fragrance of Christianity about it.

The reasons which the testator gives are objectionable and derogatory to Christianity; they assume that a difference of opinion upon some religious tenets is of more importance than a Christian education, and in order to get rid of superfluous branches, they lay the axe to the root of the tree itself. The same objection is made

by all the lower and vulgar class of the opponents of Christianity. The first step of infidelity is to clamour against the multitude of sects. Volney, 84, (Ruins of Empires,) says, " they all preach damnation against each other, and all cry out ' our holy religion.' " The opposite counsel say that Girard was in a difficulty, because if he had thrown open the college to all sects indiscriminately, they would not have agreed with each other. But if it had been so, these orphan children would not have been in a worse condition than other children, and what father would not have preferred that his children should go to this college under any form, than no form of religion? All sects believe in a future state and in a creator of the world. Suppose we carried out these principles of exclusion into our social relations. Differing as we do about 'government, it would tear up society by the roots. All preachers unite in many points; they would all agree with Franklin, who is reported in the letters of John Adams to his wife, to have said in the days of trouble, " let us have prayers."

[Mr. *Binney* here cited the following authorities to show that Jewish charities can be sustained. 1 Ambler, 228, note; 2 Swanston, 487; 7 Vesey, 417; Sheltford, 107; Boyle, 27.]

Mr. *Webster* said the distinction between the Jewish cases and the present is, that the former were within the ordinary rules of law, whereas this devise could only be sustained by being brought under the peculiar favour of the court, as it belongs to that class of charities. But what would be the condition of a youth coming fresh from this college? He could not be a witness in any court. He had never been taught to believe in a future state of rewards and punishments, because this is a " tenet" upon which he is enjoined not to make up his mind until he can examine for himself. What parent would bring up his child to the age of eighteen years without teaching him religion? What is an oath in heathen lands as well as our own? It is a religious appeal, founded upon a conviction that perjury will be punished hereafter. But if no superior power is acknowledged, the party cannot be a witness. Our lives and liberties and property all rest upon the sanctity of oaths. It is said that there will be no teaching against Christianity in this college, but I deny it. The fundamental doctrine is, that the youthful heart is not a proper receptacle for religion. This is not the charity of instruction. In monasteries education was always blended with religious teaching. The statute 4 Henry 4, chap. 12, in 1402, established charities of religion, (2 Pickering, 433,) and directed the schoolmaster to perform

divine service, and instruct the children. 1 Edward 6, chap. 14, to the same effect. 2 Swanston, 526, 529, says that care was always taken to educate youths in the doctrines of Christianity, which is a part of the common law of England. That it is so, see 1 Benson, 296 ; 2 Strange, 834 ; 3 Merivale, 405 ; 2 Burn's Ecclesiastical Law, 95 ; 2 Russell, 501 ; Younge and Collyer's Reports in Chancery, 413, Attorney-General v. Cullum, a full authority.

In this last case there was a charity for the use of the parish, but no provision for religious education. The court said that if the fund were to be applied to education at all, a part of it must go to religious education ; not the particular doctrines of the Church of England, but religion in a more comprehensive sense.

Bache, in his Course of Education in Europe, describes a monitorial school in Liverpool upon Bell's plan, but divine service is performed every Sunday. In Shepherd, 105, the cases are summed up.

As to the Smithsonian legacy and the University of Virginia, the former is not carried out, and the latter is no charity. Upon this branch of the case the whole argument may be presented in the following question, " Is a school, founded clearly on the principles of infidelity, a charity in the appropriate sense of that word ?"

2. What is the law or public policy of Pennsylvania?

If there be a settled policy there, no gift or devise to overturn it can be recognised. It is an independent state, a popular government recognising all guarantees of popular liberty. It is lawful to speak or write against all these guarantees, such as trial by jury, &c., but if the aid of a court be asked to carry on these attacks, it will be refused.

Mr. Girard in his lifetime might have paid people to write against the right of suffrage, but it is a different thing when it assumes the shape of a charitable devise, and requires the strong aid of a court to carry out the design. The Christian religion is as much a part of the public law as any of these guarantees. The charter says that Penn came over to spread the Christian religion ; and the legislatures have often acted upon this principle, as where they punished the violation of the Lord's day. That it is a part of the common law, see 11 Serg. and Rawle, 394, Updegraff v. The Commonwealth. So the court set aside a trust because it was inconsistent with public policy. See the case of the Methodist church, 5 Watts. The policy of a country is established either by law, or courts, or general con-

sent. That Christianity is a part of the public law of Pennsylvania by general consent, if there were no other source of authority, the churches, meeting-houses, spires, and even grave-yards over the face of the country all show. The dead prove it as well as the living.

If the trust cannot be executed, can it be reformed ?

Who is to do it? The doctrine of *cy-pres* cannot apply and give the benefit to some other society. It would be an extravagant application of the doctrine. Who is to supply the place of the trust stricken out? The trustee cannot. It is a case where there is no doubt of the intentions of the testator. They are positive. In other cases there is room for discretion, but none here. The testator calls these articles restrictions and limitations. Courts of equity have gone to an extravagant length in *cy-pres* cases, but it is impossible to reach this.

7 Vesey, 490, said that if authority were out of the way, the gift would be void, and the case be one of intestacy; but the court thought itself bound to follow authority and decree that the testator should be charitable in the court's way. See also Strange, 127, Attorney-General *v.* Dowling. But the entire doctrine of *cy-pres* is rejected by the Pennsylvania courts. See 17 Serg. and Rawle, 93; 1 Watts, 226.

As to the second division of the argument of the case, what is the law of Pennsylvania with respect to such devises?

This court will adopt the construction which the courts of a state place upon its laws. 2 Cranch, 87; 11 Wheat. 361; 2 Peters, 58; 6 Peters, 290; 12 Wheat. 153. There have been four cases decided in Pennsylvania, viz.: 17 Serg. and Rawle, 88, Witman *v.* Lex; 1 Pennsylvania Rep. 49, McGin *v.* Aaron; 3 Rawle, 170, Mayor, &c. *v.* Elliott, &c.; 1 Watts, 218, Methodist Church *v.* Remington. All these cases are in our favour, except a single *dictum* in one of them. The opposite counsel are obliged to reject the points decided in two. In the first case it was decided that the statute of Elizabeth was not in force, and the devise was not so uncertain as to be void. The second was a gift to a congregation for a house of religious worship; in the third there was no uncertainty in the *cestui que trust*, and in the fourth the trust was declared void.

The old records of England do not militate against the decision of this court in the case of the Baptist association. (4 Wheat. 1.) There is believed to be no case in them of an indefinite charity in

perpetuity sustained by the authority of chancery prior to the time of Henry 8. Corporations competent to take, whether aggregate or sole, are not included within this remark. Decisions before the 43 Elizabeth are apt to be misunderstood, because the term " charity" is applied to cases where there is no uncertainty. 1 Proceedings in Chancery, 208. Of the fifty cases cited from the old records, only three are given at length; in one of which the objects of the trust are specially declared, and in the other two there was a license from the king. All the cases referred to did not take place before the time of Elizabeth.*

---

* The following remarks upon the old records of England, were hastily drawn up and presented to the court by Mr. *Cadwallader*, one of the counsel for the complainants:—

The new information developed by the researches of the counsel of the appellees, upon the obscure subject of the law of charities before the statutes 39 and 43 Eliz., tends rather to confirm than to invalidate the opinion of this court expressed in the Baptist Church case, that there is no satisfactory evidence of an uncertain charity of indefinite duration having been enforced before the statute, or since the statute without its aid.

Cases of frankalmoigne, the Templars, the Hospitalers, &c., &c., were those of corporations sole or aggregate. Counsel on both sides concur that the dissolution of monasteries, and of certain ecclesiastical aggregate and sole corporations, and the recusancy and consequent disfranchisement of many incumbents of benefices of this description, had, by the time of Elizabeth, caused many charities, previously valid, to fail for want of their anterior support of corporate trustees or administrators. The recitals and enactments of the statutes of this and the previous reigns, and particularly of the 39 and 43 Eliz. may be explained by a due regard to this portion of the previous history of England. This is affirmed on both sides of the argument. It is not perceived that any just reasoning on this foundation tends to support the proposition that indefinite uncertain charities could subsist without the aid of an incorporation. On the contrary, the natural inference appears to be, that they could not be otherwise maintained, without statutory assistance.

Judicial recognitions of charities before 39 and 43 Eliz. are liable to be misapplied, unless due care be observed in ascertaining the definition of a charity as understood at that day. The cases in which nothing more is said than that the trust, or use, or purpose was a charitable one, prove nothing. Whatever the true modern technical definition may be, the passages cited from Reeves' History prove, that the term charity in the olden time was frequently applied to trusts which were neither uncertain in their objects nor perpetual in their duration; in other words, to subjects for which a trust could have been maintained according to the ordinary rules of property, as contradistinguished from the rules of charities. Edwards *v.* Kimpton, read from (Record Commission) 1 Ca

Vidal et al. *v.* Girard's Executors.

The acts of the legislature of Pennsylvania after the death of Girard can have no effect upon the rights of parties which were then vested.

The case in 3 Peters, 99, 115, Inglis *v.* The Trustees of the

---

lendar of Proceedings in Chancery, 280, was the case of a rent granted for the relief of the converts inhabiting the house belonging to the Master of the Rolls. In Lyon *v.* Hews, same publication, vol. 2, p. 44, both bill and answer mention works of charity as the objects of the trust to be enforced, and state that the property had been left for religious and charitable purposes. But the purposes and objects of this trust were specifically declared, and were, 1st. Finding a priest by a year in a certain church; 2d. Making an aisle in the porch of the same church; 3d. Marriage of five poor maidens; and 4th. Amending the highways in the lane behind the mews. Of these uses none was to be extended to a perpetuity, and none was in any greater degree uncertain than must necessarily be the case with objects of a power or discretion exercisable within the period of a perpetuity. So in Alderman Symond's case, in Moore's Readings, Duke, 163; the "charitable use," decreed before the statute, "upon ordinary and judicial equity in chancery," though not described as to its objects, appears to have been one of which a final disposition could be made within a reasonable period. The case in 38 Assizes, 222, (a) vol. 3, was one in which the distribution, for the good of the testator's soul, was to be made by his executors; i. e. within a life in being. Of the fifty cases quoted from these Calendars, three only are stated at length. Of the rest nothing more than a meager abstract is presented. Of the three which are given at large, one, Lyon *v.* Hews, is mentioned above. In each of the two others, a patent or license had been obtained from the crown, enabling the trustees to hold the land conformably to the provisions of the trust. In many of the other cases, the proceedings, if given in full, would doubtless indicate the same thing. The statutes of mortmain must otherwise have prevented the grants from being available. One of the cases mentioned in the Calendar, vol. 2, p. 264, Newton *v.* Kitteridge, a bill to protect the complainant's title against an inquisition for charitable uses, by which his land had been found to have been given to the poor of Aldham, certainly occurred after, and was founded on the 43 or 39 Eliz. The same thing is probably true of very many of the others of which the date is not given. It is remarkable that although all of the cases in the Calendar on various subjects are entitled as of the reign of Elizabeth, or of earlier reigns, some of them, in the places where abstracted, are stated to have occurred during the usurpation, and others at dates in the reign of James I. Of all the cases in the Calendar, only seven, including the three above mentioned, are shown to have occurred before the statute 39 Eliz. But all this is perhaps unimportant here. Upon such examination as has been practicable, it is apprehended that none of the cases previous to 39 Eliz., and none of those of uncertain date, can be said affirmatively to have been instances of indefinite perpetual charity.

To understand some of them it is necessary to refer to 1 Edw. 6, c. 14, which made masters of grammar schools corporations sole; and to understand a

Vidal et al. v. Girard's Executors.

Sailor's Snug Harbour, rested upon the ground that the devise was good as an executory devise.

If the devise in trust be void in this case, what becomes of the fee? It must rest somewhere. In England, where a devise was made to a corporation which could not take, the fee was decided to be in the heir at law. Hobart, 136. But where a court of chancery charges itself with the whole administration of the charity, it takes possession of the fee as an incident to this power. In Pennsylvania there is no such authority anywhere, and this court cannot exercise it. What is done in England is done by virtue of the statute of Elizabeth, which has no force in this case. Suppose the corporation had renounced the trust, what would have become of the fee? Could the court in such case have divested the heirs of the fee and appointed another trustee? There is no power to remodel a trust as in England, or to exercise a right of visitation.

There is a want of power in the trustee to administer the charity. The fee must rest in the entire body of the corporation whilst others

larger number of them, it will be right to refer to the doctrine which prevailed before the statute of Elizabeth, under which, gifts of chattels to the poor of a municipal or religious corporation, were sustained as gifts to the corporation; a doctrine which affirms the competency of the corporation, and the incapacity of the poor. This doctrine is thus laid down in the note to the case in 38 Assizes, mentioned above. It is there stated to have been the opinion of the court that if a man give bond or other thing, to A. and B., parishioners of a certain church, and to the parishioners of the said church, the gift is good, and it vests in the church, &c. The same doctrine, in those days, was held in the case of land where there had been a license or dispensation with the mortmain acts. Of course the same rule applied where there was a trust for a corporation, or for its poor, or its members. If the purposes of the grant were consistent with the objects of the charter, the gift could be sustained independently of the peculiar law of charities. Now, with the exception of four or five instances where the charity does not appear to have been of undefined duration, and of which the date, whether before or after the statute 39 Eliz. does not appear, it is believed, subject to correction, that in all the cases cited from this Calendar, and not already particularly noticed, there had been a grant or devise to, or in trust for, a municipal or private corporation; and in most instances the proceeding was by, or on behalf of, such a corporation. These cases, therefore, furnish strong negative evidence that the law before the statutes 39 and 43 Eliz. did not rest on the same footing as it has since stood upon. If it had been thus established, the trustees for the inhabitants of a municipality, or for the poor of a parish or a church, would not have needed the protection of the corporations and *quasi* corporations, under whose capacity to take and to enjoy, they appear to have thought it necessary to shelter themselves.

Q

are administering the trust. It is true that sometimes trusts have been conferred on the heads of corporations, and the whole body been held responsible. But the will here can give no power. There is no connection between this trust and the powers of the corporation. The school is out of the city, and the only interest which the city has in it is that some of the poor may be provided for. But suppose a defalcation to take place. The mayor, &c., are chosen for the purpose of laying city taxes for city purposes. Can they levy a tax to replace the sum thus abstracted? Are the whole people of the city responsible by taxation for an abuse of trust? Yet they are a part of the corporation which is the trustee. The 16 section of the charter contains the power to hold land, but this does not go far enough. If the city cannot execute the trust, what becomes of it? It was the intention of the testator that a particular trustee and no other should execute it, and if that trustee is incapable of doing it, the trust must fail altogether.

By the Pennsylvania statutes of 1730, 1791, and 1833, the policy of the state is shown to be that a moderate limit is fixed for the amount of property held for religious or charitable purposes, first of £500, and afterwards $2000. These laws are intended to act upon just such devises as this. Can it be said, with these laws in view, that an unincorporated body, such as these boys, or any one in trust for them, can hold property to the amount of $2,000,000? The policy of the state is to prevent large amounts in perpetuity, and if any one desires to exceed the limits fixed in those laws he must apply to the legislature for a special permission. Constitution of Pennsylvania, sect. 37 ; Purdon's Digest, title Estates-tail.

Where is the supervisory power over this trust? In 2 Vesey, 43, Attorney-General *v.* Foundling Hospital, it is said that chancery must supervise. When it is given to a corporation with power to trustees to go on, there is no need of a supervisory power except to protect the fund. 2 Bro. Chan. Ca. 220, 236.

In 17 Vesey, 409, it is said that if there are no visitors appointed in the charter, the chancellor interferes to visit, through a petition addressed to him as keeper of the great seal, representing the king in person. But there is no such power to be found any where in Pennsylvania. Girard should have provided for a charter, and the legislature could have seen how much property was going into mortmain and directed accordingly.

The city is incapable of executing this trust, because it cannot make

contracts beyond the range of its charter. Suppose the trust should not be faithfully carried out by any agents, and the corporation be held responsible. In Pennsylvania, in case of a judgment against a corporation, any money on its way to the treasury can be arrested. In Bridgeport, Connecticut, the corporation issued bonds upon which there was a judgment, and private property in dwelling-houses seized in execution; yet these persons could not prevent the bonds from being issued. There is no security anywhere for any species of property except by holding corporations to a strict exercise of their power. No good can be looked for from this college. If Girard had desired to bring trouble, and quarrel, and struggle upon the city, he could have done it in no more effectual way. The plan is unblessed in design and unwise in purpose. If the court should set it aside, and I be instrumental in contributing to that result, it will be the crowning mercy of my professional life.

Mr. Justice STORY delivered the opinion of the court.

This cause has been argued with great learning and ability. Many topics have been discussed in the arguments, as illustrative of the principal grounds of controversy, with elaborate care, upon which, however, in the view which we have taken of the merits of the cause, it is not necessary for us to express any opinion, nor even to allude to their bearing or application. We shall, therefore, confine ourselves to the exposition of those questions and principles which, in our judgment, dispose of the whole matters in litigation; so far at least as they are proper for the final adjudication of the present suit.

The late Stephen Girard, by his will dated the 25th day of December, A. D. 1830, after making sundry bequests to his relatives and friends, to the city of New Orleans, and to certain specified charities, proceeded in the 20th clause of that will to make the following bequest, on which the present controversy mainly hinges. "XX. And whereas I have been for a long time impressed," &c. [See the statement prepared by the reporter.]

The testator then proceeded to give a minute detail of the plan and structure of the college, and certain rules and regulations for the due management and government thereof, and the studies to be pursued therein, " comprehending reading, writing, grammar, arithmetic, geography, navigation, surveying, practical mathematics, astronomy, natural, chemical, and experimental philosophy, the

French and Spanish languages," (not forbidding but not recommending the Greek and Latin languages,) " and such other learning and science as the capacities of the several scholars may merit or warrant." He then added, " I would have them taught facts and things rather than words or signs; and especially I desire that by every proper means a pure attachment to our republican institutions, and to the sacred rights of conscience as guarantied by our happy constitutions shall be formed and fostered in the minds of the scholars."

The persons who are to receive the benefits of the institution he declared to be, " poor white male orphans between the ages of six and ten years; and no orphan should be admitted until the guardians or directors of the poor, or other proper guardian, or other competent authority, have given by indenture, relinquishment or otherwise, adequate power to the mayor, aldermen, and citizens of Philadelphia, or to directors or others by them appointed, to enforce in relation to each orphan every proper restraint, and to prevent relatives or others from interfering with, or withdrawing such orphan from the institution." The testator then provided for a preference, " first, to orphans born in the city of Philadelphia; secondly, to those born in any other part of Pennsylvania; thirdly, to those born in the city of New York; and lastly, to those born in the city of New Orleans." The testator further provided that the orphan " scholars who shall merit it, shall remain in the college until they shall respectively arrive at between fourteen and eighteen years of age."

The testator then, after suggesting that in relation to the organization of the college and its appendages, he leaves necessarily many details to the mayor, aldermen, and citizens of Philadelphia, and their successors. proceeded to say : " there are, however, some restrictions which I consider it my duty to prescribe, and to be, amongst others, conditions on which my bequest for said college is made and to be enjoyed, namely : First, I enjoin and require," &c. [See statement of the reporter.] This second injunction and requirement is that which has been so elaborately commented on at the bar, as derogatory to the Christian religion, and upon which something will be hereafter suggested in the course of this opinion.

The testator then bequeathed the sum of \$500,000 to be invested, and the income thereof applied to lay out, regulate, and light and pave a passage or street in the east part of the city of Philadelphia, fronting the river Delaware, not less than twenty-one feet wide and to be called Delaware Avenue, &c. ; and to this intent to obtain such

acts of Assembly, and to make such purchases or agreements as will enable the mayor, aldermen, and citizens of Philadelphia to remove or pull down all the buildings, fences, and obstructions, which may be in the way, and to prohibit all buildings, fences, or erections of any kind to the eastward of said avenue, &c., &c. ; and he proceeded to give other minute directions touching the same.

The testator then bequeathed to the commonwealth of Pennsylvania the sum of $300,000 for the purpose of internal improvement by canal navigation, to be paid into the state treasury as soon as such laws shall be enacted by the legislature to carry into effect the several improvements before specified, and certain other improvements.

The testator then bequeathed the remainder of the residue of his personal estate in trust to invest the same in good securities, &c., so that the whole shall form a permanent fund, and to apply the income thereof to certain specified purposes, which he proceeds to name ; and then said : " To all which objects," &c. [See statement of the reporter.]

These are the material clauses of the will which seem necessary to be brought under our review in the present controversy. By a codicil dated the 20th of June, A. D. 1831, the testator made the following provision : " Whereas I, Stephen Girard, the testator named in the foregoing will and testament, dated February 16th, 1830, have since the execution thereof, purchased several parcels and pieces of land and real estate, and have built sundry messuages, all of which, as well as any real estate that I may hereafter purchase, it is my intention to pass by said will ; and whereas, in particular, I have recently purchased from Mr. William Parker, the mansion-house, out-buildings, and forty-five acres and some perches of land, called Peel Hall, on the Ridge road, in Penn Township : Now, I declare it to be my intention, and I direct, that the orphan establishment, provided for in my said will, instead of being built as therein directed upon my square of ground between High and Chestnut and Eleventh and Twelfth streets, in the city of Philadelphia, shall be built upon the estate so purchased from Mr. W. Parker, and I hereby devote the said estate to that purpose, exclusively, in the same manner as I had devoted the said square, hereby directing that all the improvements and arrangements for the said orphan establishment, prescribed by my said will, as to said square, shall be made and executed upon the said estate, just as if I had in my will devoted the said estate to said purpose—consequently, the said square of ground is to consti-

tute, and I declare it to be a part of the residue and remainder of my
real and personal estate, and given and devised for the same uses
and purposes as are declared in section twenty of my will, it being
my intention, that the said square of ground shall be built upon, and
improved in such a manner as to secure a safe and permanent income
for the purposes stated in said twentieth section." The testator died
in the same year; and his will and codicil were duly admitted to
probate on the 31st of December of the same year.

The legislature of Pennsylvania passed the requisite laws to carry
into effect the will, so far as respected the bequests of the $500,000
for the Delaware Avenue and the $300,000 for internal improvement
by canal navigation, according to the request of the testator.

The present bill is brought by the heirs at law of the testator, to
have the devise of the residue and remainder of the real estate to the
mayor, aldermen, and citizens of Philadelphia in trust as aforesaid to
be declared void, for the want of capacity of the supposed devisees
to take lands by devise, or if capable of taking generally by devise
for their own use and benefit, for want of capacity to take such lands
as devisees in trust; and because the objects of the charity for which
the lands are so devised in trust are altogether vague, indefinite, and
uncertain, and so no trust is created by the said will which is capable
of being executed or of being cognisable at law or in equity, nor any
trust-estate devised that can vest at law or in equity in any existing
or possible *cestui que trust;* and therefore the bill insists that as the
trust is void, there is a resulting trust thereof for the heirs at law of
the testator; and the bill accordingly seeks a declaration to that effect
and the relief consequent thereon, and for a discovery and account,
and for other relief.

The principal questions, to which the arguments at the bar have
been mainly addressed, are; First, whether the corporation of the
city of Philadelphia is capable of taking the bequest of the real and
personal estate for the erection and support of a college upon the
trusts and for the uses designated in the will: Secondly, whether
these uses are charitable uses valid in their nature and capable of
being carried into effect consistently with the laws of Pennsylvania:
Thirdly, if not, whether, being void, the fund falls into the residue
of the testator's estate, and belongs to the corporation of the city, in
virtue of the residuary clause in the will; or it belongs, as a resulting
or implied trust, to the heirs and next of kin of the testator.

As to the first question, so far as it respects the capacity of the

corporation to take the real and personal estate, independently of the trusts and uses connected therewith, there would not seem to be any reasonable ground for doubt. The act of 32 and 34 Henry 8, respecting wills, excepts corporations from taking by devise; but this provision has never been adopted into the laws of Pennsylvania or in force there. The act of 11th of March, 1789, incorporating the city of Philadelphia, expressly provides that the corporation, thereby constituted by the name and style of the Mayor, Aldermen, and Citizens of Philadelphia, shall have perpetual succession, " and they and their successors shall at all times for ever be capable in law to have, purchase, take, receive, possess, and enjoy lands, tenements and hereditaments, liberties, franchises and jurisdictions, goods, chattels, and effects to them and their successors for ever, or for any other or less estate," &c., without any limitation whatsoever as to the value or amount thereof, or as to the purposes to which the same were to be applied, except so far as may be gathered from the preamble of the act, which recites that the then administration of government within the city of Philadelphia was in its form " inadequate to the suppression of vice and immorality, to the advancement of the public health and order, and to the promotion of trade, industry, and happiness, and in order to provide against the evils occasioned thereby, it is necessary to invest the inhabitants thereof with more speedy, rigorous, and effective powers of government than at present established." Some, at least, of these objects might certainly be promoted by the application of the city property or its income to them—and especially the suppression of vice and immorality, and the promotion of trade, industry, and happiness. And if a devise of real estate had been made to the city directly for such objects, it would be difficult to perceive why such trusts should not be deemed within the true scope of the city charter and protected thereby.

But without doing more at present than merely to glance at this consideration, let us proceed to the inquiry whether the corporation of the city can take real and personal property in trust. Now, although it was in early times held that a corporation could not take and hold real or personal estate in trust upon the ground that there was a defect of one of the requisites to create a good trustee, viz., the want of confidence in the person; yet that doctrine has been long since exploded as unsound, and too artificial; and it is now held, that where the corporation has a legal capacity to take real or personal estate, there it may take and hold it upon trust, in the same

manner and to the same extent as a private person may do. It is true that, if the trust be repugnant to, or inconsistent with the proper purposes for which the corporation was created, that may furnish a ground why it may not be compellable to execute it. But that will furnish no ground to declare the trust itself void, if otherwise unexceptionable; but it will simply require a new trustee to be substituted by the proper court, possessing equity jurisdiction, to enforce and perfect the objects of the trust. This will be sufficiently obvious upon an examination of the authorities; but a single case may suffice. In Sonley v. The Clockmaker's Company, 1 Bro. Ch. R. 81, there was a devise of freehold estate to the testator's wife for life, with remainder to his brother C. in tail male, with remainder to the Clockmaker's Company, in trust to sell for the benefit of the testator's nephews and nieces. The devise being to a corporation, was, by the English statute of wills, void, that statute prohibiting devises to corporations, and the question was, whether the devise being so void, the heir at law took beneficially or subject to the trust. Mr. Baron Eyre, in his judgment, said, that although the devise to the corporation be void at law, yet the trust is sufficiently created to fasten itself upon any estate the law may raise. This is the ground upon which courts of equity have decreed, in cases where no trustee is named. Now, this was a case not of a charitable devise, but a trust created for nephews and nieces; so that it steers wide from the doctrines which have been established as to devises to corporations for charities as appointments under the statute of 43 Elizabeth: *à fortiori*, the doctrine of this case must apply with increased stringency to a case where the corporation is capable at law to take the estate devised, but the trusts are utterly dehors the purposes of the incorporation. In such a case, the trust itself being good, will be executed by and under the authority of a court of equity. Neither is there any positive objection in point of law to a corporation taking property upon a trust not strictly within the scope of the direct purposes of its institution, but collateral to them; nay, for the benefit of a stranger or of another corporation. In the case of Green v. Rutherforth, 1 Ves. R. 462, a devise was made to St. John's College in Cambridge of the perpetual advowson of a rectory in trust, that whenever the church should be void and his nephew be capable of being presented thereto, they should present him; and on the next avoidance should present one of his name and kindred, if there should be any one capable thereof in the college; if none such, they should present the

senior divine then fellow of the college, and on his refusal the next senior divine, and so downward; and, if all refused, they should present any other person they should think fit. Upon the argument of the cause, an objection was taken that the case was not cognisable in a court of equity, but fell within the jurisdiction of the visitor. Sir John Strange (the Master of the Rolls) who assisted Lord Hardwicke at the hearing of the cause, on that occasion said: "A private person would, undoubtedly, be compellable to execute it (the trust;) and, considered as a trust, it makes no difference who are the trustees, the power of this court operating on them in the capacity of trustees. And though they are a collegiate body whose founder has given a visitor to superintend his own foundation and bounty; yet as between one claiming under a separate benefactor and these trustees for special purposes, the court will look on them as trustees only, and oblige them to execute it under direction of the court." Lord Hardwicke, after expressing his concurrence in the judgment of the Master of the Rolls, put the case of the like trust being to present no member of another college, and held that the court would have jurisdiction to enforce it.

But if the purposes of the trust be germane to the objects of the incorporation; if they relate to matters which will promote, and aid, and perfect those objects; if they tend (as the charter of the city of Philadelphia expresses it) "to the suppression of vice and immorality, to the advancement of the public health and order, and to the promotion of trade, industry, and happiness," where is the law to be found which prohibits the corporation from taking the devise upon such trusts, in a state where the statutes of mortmain do not exist, (as they do not in Pennsylvania,) the corporation itself having a legal capacity to take the estate as well by devise as otherwise? We know of no authorities which inculcate such a doctrine or prohibit the execution of such trusts, even though the act of incorporation may have for its main objects mere civil and municipal government and regulations and powers. If, for example, the testator by his present will had devised certain estate of the value of $1,000,000 for the purpose of applying the income thereof to supplying the city of Philadelphia with good and wholesome water for the use of the citizens, from the river Schuylkill, (an object which some thirty or forty years ago would have been thought of transcendant benefit,) why, although not specifically enumerated among the objects of the charter, wc `ld not such a devise upon such a trust have been valid,

and within the scope of the legitimate purposes of the corporation, and the corporation capable of executing it as trustees? We profess ourselves unable to perceive any sound objection to the validity of such a trust; and we know of no authority to sustain any objection to it. Yet, in substance, the trust would be as remote from the express provisions of the charter as are the objects (supposing them otherwise maintainable) now under our consideration. In short, it appears to us that any attempt to narrow down the powers given to the corporation so as to exclude it from taking property upon trusts for purposes confessedly charitable and beneficial to the city or the public, would be to introduce a doctrine inconsistent with sound principles, and defeat instead of promoting the true policy of the state. We think, then, that the charter of the city does invest the corporation with powers and rights to take property upon trust for charitable purposes, which are not otherwise obnoxious to legal animadversion; and, therefore, the objection that it is incompetent to take or administer a trust is unfounded in principle or authority, under the law of Pennsylvania.

It is manifest that the legislature of Pennsylvania acted upon this interpretation of the charter of the city, in passing the acts of the 24th of March, and the 4th of April, 1832, to carry into effect certain improvements and execute certain trusts, under the will of Mr. Girard. The preamble to the trust act, expressly states that it is passed "to effect the improvements contemplated by the said testator, and to execute, in all other respects, the trusts created by his will," as to which, the testator had desired the legislature to pass the necessary laws. The tenth section of the same act, provides "That it shall be lawful for the mayor, aldermen, and citizens of Philadelphia, to exercise all such jurisdiction, enact all such ordinances, and to do and execute all such acts and things whatsoever, as may be necessary and convenient for the full and entire acceptance, execution, and prosecution of any and all the devises, bequests, trusts, and provisions contained in the said will, &c., &c.; to carry which into effect," the testator had desired the legislature to enact the necessary laws. But what is more direct to the present purpose, because it imports a full recognition of the validity of the devise for the erection of the college, is the provision of the 11th section of the same act, which declares "That no road or street shall be laid out, or passed through the land in the county of Philadelphia, bequeathed by the late Stephen Girard for the erection of a college, unless the same shall be recommended by

the trustees or directors of the said college, and approved by a majority of the select and common councils of the city of Philadel-. phia." The other act is also full and direct to the same purpose, and provides "That the select and common councils of the city of Philadelphia, shall be and they are hereby authorized to provide, by ordinance or otherwise, for the election or appointment of such officers and agents as they may deem essential to the due execution of the duties and trusts enjoined and created by the will of the late Stephen Girard." Here then, there is a positive authority conferred upon the city authorities to act upon the trusts under the will, and to administer the same through the instrumentality of agents appointed by them. No doubt can then be entertained, that the legislature meant to affirm the entire validity of those trusts, and the entire competency of the corporation to take and hold the property devised upon the trusts named in the will.

It is true that this is not a judicial decision, and entitled to full weight and confidence as such. But it is a legislative exposition and confirmation of the competency of the corporation to take the property and execute the trusts; and if those trusts were valid in point of law, the legislature would be estopped thereafter to contest the competency of the corporation to take the property and execute the trusts, either upon a *quo warranto* or any other proceeding, by which it should seek to devest the property, and invest other trustees with the execution of the trusts, upon the ground of any supposed incompetency of the corporation. And if the trusts were in themselves valid in point of law, it is plain that neither the heirs of the testator, nor any other private persons, could have any right to inquire into, or contest the right of the corporation to take the property, or to execute the trusts; but this right would exclusively belong to the state in its sovereign capacity, and in its sole discretion, to inquire into and contest the same by a *quo warranto*, or other proper judicial proceeding. In this view of the matter, the recognition and confirmation of the devises and trusts of the will by the legislature, are of the highest importance and potency.

We are, then, led directly to the consideration of the question which has been so elaborately argued at the bar, as to the validity of the trusts for the erection of the college, according to the requirements and regulations of the will of the testator. That the trusts are of an eleemosynary nature, and charitable uses in a judicial sense, we entertain no doubt. Not only are charities for the maintenance

and relief of the poor, sick, and impotent, charities in the sense of the common law, but also donations given for the establishment of colleges, schools, and seminaries of learning, and especially such as are for the education of orphans and poor scholars.

The statute of the 43 of Elizabeth, ch. 4, has been adjudged by the Supreme Court of Pennsylvania not to be in force in that state. But then it has been solemnly and recently adjudged by the same court, in the case of Zimmerman *v.* Andres, (January term, 1844,) that "it is so considered rather on account of the inapplicability of its regulations as to the modes of proceeding, than in reference to its conservative provisions." "These have been in force here by common usage and constitutional recognition; and not only these, but the more extensive range of charitable uses which chancery supported before that statute and beyond it." Nor is this any new doctrine in that court; for it was formally promulgated in the case of Witman *v.* Lex, 17 Serg. and Rawle, 88, at a much earlier period, (1827.)

Several objections have been taken to the present bequest to extract it from the reach of these decisions. In the first place, that the corporation of the city is incapable by law of taking the donation for such trusts. This objection has been already sufficiently considered. In the next place, it is said, that the beneficiaries who are to receive the benefit of the charity are too uncertain and indefinite to allow the bequest to have any legal effect, and hence the donation is void, and the property results to the heirs. And in support of this argument we are pressed by the argument that charities of such an indefinite nature are not good at the common law, (which is admitted on all sides to be the law of Pennsylvania, so far as it is applicable to its institutions and constitutional organization and civil rights and privileges) and hence the charity fails; and the decision of this court in the case of the trustees of the Philadelphia Baptist Association *v.* Hart's Executors, 4 Wheat. R. 1, is strongly relied on as fully in point. There are two circumstances which materially distinguish that case from the one now before the court. The first is, that that case arose under the law of Virginia, in which state the statute of 43 Elizabeth, ch. 4, had been expressly and entirely abolished by the legislature, so that no aid whatsoever could be derived from its provisions to sustain the bequest. The second is, that the donees (the trustees) were an unincorporated association, which had no legal capacity to take and hold the donation in succession for the purposes of the trust, and the beneficiaries also were uncertain and indefinite.

Both circumstances, therefore, concurred; a donation to trustees incapable of taking, and beneficiaries uncertain and indefinite. The court, upon that occasion, went into an elaborate examination of the doctrine of the common law on the subject of charities, antecedent to and independent of the statute of 43 Elizabeth, ch. 4, for that was still the common law of Virginia. Upon a thorough examination of all the authorities and all the lights, (certainly in no small degree shadowy, obscure, and flickering,) the court came to the conclusion that, at the common law, no donation to charity could be enforced in chancery, where both of these circumstances, or rather, where both of these defects occurred. The court said: "We find no dictum that charities could be established on such an information (by the attorney-general) where the conveyance was defective or the donation was so vaguely expressed that the donee, if not a charity, would be incapable of taking." In reviewing the authorities upon that occasion, much reliance was placed upon Collison's case, Hobart's Rep. 136; (S. C. cited Duke on Charities, by Bridgman, 368, Moore, R. 888,) and Platt v. St. John's College, Cambridge, Finch. Rep. 221; (S. C. 1 Cas. in Chan. R. 267, Duke on Charities, by Bridgman, 379,) and the case reported in 1 Chancery Cases, 134. But these cases, as also Flood's case, Hob. R. 136, (S. C. 1 Equity Abridg. 95, pl. 6,) turned upon peculiar circumstances. Collison's case was upon a devise in 15 Henry 8, and was before the statute of wills. The other cases were cases where the donees could not take at law, not being properly described, or not having a competent capacity to take, so that there was no legal trustee; and yet the devises were held good as valid appointments under the statute of 43 Elizabeth. The dictum of Lord Loughborough in Attorney-General v. Bowyer, 3 Ves. 714, 726, was greatly relied on, where he says: "It does not appear that this court at that period (that is before the statute of wills) had cognisance upon information for the establishment of charities. Prior to the time of Lord Ellesmere, as far as tradition in times immediately following goes, there were no such informations as this on which I am now sitting, (an information to establish a college under a devise before the statute of mortmain of 9 Geo. 2, ch. 36;) but they made out their case as well as they could at law." In this suggestion Lord Loughborough had under his consideration Porter's case, 1 Co. Rep. 16. But there a devise was made in 32 Henry 8, to the testator's wife, upon condition for her to grant the lands, &c., in all convenient speed after his decease

for the maintenance and continuance of a certain free-school, and almsmen and almswomen for ever. The heir entered for and after condition broken, and then conveyed the same lands to Queen Elizabeth in 34 of her reign; and the queen brought an information of intrusion against Porter for the land in the same year. One question was, whether the devise was not to a superstitious use, and therefore void under the act of 23 Henry 8, ch. 2, or whether it was good as a charitable use. And it was resolved by the court that the use was a good charitable use, and that the statute did not extend to it. So that here we have a plain case of a charity held good, before the statute of Elizabeth, upon the ground of the common law, there being a good devisee originally, although the condition was broken and the use was for charitable purposes in some respects indefinite. Now if there was a good devisee to take as trustee, and the charity was good at the common law, it seems somewhat difficult to say, why, if no legal remedy was adequate to redress it, the Court of Chancery might not enforce the trust, since trusts for other specific purposes, were then, at least when there were designated trustees, within the jurisdiction of chancery.

There are, however, dicta of eminent judges, (some of which were commented upon in the case of 4 Wheat. R. 1,) which do certainly support the doctrine that charitable uses might be enforced in chancery upon the general jurisdiction of the court, independently of the statute of 43 of Elizabeth; and that the jurisdiction had been acted upon not only subsequent but antecedent to that statute. Such was the opinion of Sir Joseph Jekyll in Eyre *v.* Countess of Shaftsbury, (2 P. Will. R. 102, 2 Equity Abridg. 710, pl. 2,) and that of Lord Northington in Attorney-General *v.* Tancred, 1 Eden, R. 10, (S. C. Ambler, R. 351, 1 Wm. Black. R. 90,) and that of Lord Chief Justice Wilmot in his elaborate judgment in Attorney-General *v.* Lady Downing, Wilmot's Notes, p. 1, 26, given after an examination of all the leading authorities. Lord Eldon, in the Attorney-General *v.* The Skinner's Company, 2 Russ. R. 407, intimates in clear terms his doubts whether the jurisdiction of chancery over charities arose solely under the statute of Elizabeth; suggesting that the statute has perhaps been construed with reference to a supposed antecedent jurisdiction of the court, by which void devises to charitable purposes were sustained. Sir John Leach, in the case of a charitable use before the statute of Elizabeth, (Attorney-General *v.* The Master of Brentwood School, 1 Mylne and Keen, 376,) said: "Although at

his time no legal devise could be made to a corporation for a charitable use, yet lands so devised were in equity bound by a trust for the charity, which a court of equity would then execute." In point of fact the charity was so decreed in that very case, in the 12th year of Elizabeth. But what is still more important is the declaration of Lord Redesdale, a great judge in equity, in the Attorney-General *v.* The Mayor of Dublin, 1 Bligh R. 312, 347, (1827,) where he says: "We are referred to the statute of Elizabeth with respect to charitable uses, as creating a new law upon the subject of charitable uses. That statute only created a new jurisdiction; it created no new law. It created a new and ancillary jurisdiction, a jurisdiction created by commission, &c.; but the proceedings of that commission were made subject to appeal to the Lord Chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for reserving the controlling jurisdiction of the Court of Chancery as it existed before the passing of that statute; and there can be no doubt that by information by the attorney-general the same thing might be done." He then adds, "the right which the attorney-general has to file an information, is a right of prerogative. The king, as *parens patriæ*, has a right, by his proper officer, to call upon the several courts of justice, according to the nature of their several jurisdictions, to see that right is done to his subjects who are incompetent to act for themselves, as in the case of charities and other cases." So that Lord Redesdale maintains the jurisdiction in the broadest terms, as founded in the inherent jurisdiction of chancery independently of the statute of 43 Elizabeth. In addition to these dicta and doctrines, there is the very recent case of the Incorporated Society *v.* Richards, 1 Drury and Warren R. 258, where Lord Chancellor Sugden, in a very masterly judgment, upon a full survey of all the authorities, and where the point was directly before him, held the same doctrine as Lord Redesdale, and expressly decided that there is an inherent jurisdiction in equity in cases of charity, and that charity is one of those objects for which a court of equity has at all times interfered to make good that, which at law was an illegal or informal gift; and that cases of charity in courts of equity in England were valid independently of and previous to the statute of Elizabeth.

Mr. Justice Baldwin, in the case of the will of Sarah Zane, which was cited at the bar and pronounced at April term of the Circuit Court, in 1833, after very extensive and learned researches into the ancient English authorities and statutes, arrived at the same conclu-

sion in which the district judge, the late lamented Judge Hopkinson, concurred; and that opinion has a more pointed bearing upon the present case, since it included a full review of the Pennsylvania laws and doctrines on the subject of charities.

But very strong additional light has been thrown upon this subject by the recent publications of the Commissioners on the public Records in England, which contain a very curious and interesting collection of the chancery records in the reign of Queen Elizabeth, and in the earlier reigns. Among these are found many cases in which the Court of Chancery entertained jurisdiction over charities long before the statute of 43 Elizabeth; and some fifty of these cases, extracted from the printed calendars, have been laid before us. They establish in the most satisfactory and conclusive manner that cases of charities where there were trustees appointed for general and indefinite charities, as well as for specific charities, were familiarly known to, and acted upon, and enforced in the Court of Chancery. In some of these cases the charities were not only of an uncertain and indefinite nature, but, as far as we can gather from the imperfect statement in the printed records, they were also cases where there were either no trustees appointed, or the trustees were not competent to take. These records, therefore, do in a remarkable manner, confirm the opinions of Sir Joseph Jekyll, Lord Northington, Lord Chief Justice Wilmot, Lord Redesdale, and Lord Chancellor Sugden. Whatever doubts, therefore, might properly be entertained upon the subject when the case of the Trustees of the Philadelphia Baptist Association *v.* Hart's Executors, 4 Wheat. 1, was before this court, (1819,) those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded.

If, then, this be the true state of the common law on the subject of charities, it would, upon the general principle already suggested, be a part of the common law of Pennsylvania. It would be no answer to say, that if so it was dormant, and that no court possessing equity powers now exists, or has existed in Pennsylvania, capable of enforcing such trusts. The trusts would nevertheless be valid in point of law; and remedies may from time to time be applied by the legislature to supply the defects. It is no proof of the non-existence of equitable rights, that there exists no adequate legal remedy to enforce them. They may during the time slumber, but they are not dead.

But the very point of the positive existence of the law of charities in Pennsylvania, has been (as already stated) fully recognised and

enforced in the state courts of Pennsylvania, as far as their remedial process would enable these courts to act. This is abundantly established in the cases cited at the bar, and especially by the case of Witman *v.* Lex, 17 Serg. and Rawle, 88, and that of Sarah Zane's will, before Mr. Justice Baldwin and Judge Hopkinson. In the former case, the court said " that it is immaterial whether the person to take be *in esse* or not, or whether the legatee were at the time of the bequest a corporation capable of taking or not, or how uncertain the objects may be, provided there be a discretionary power vested anywhere over the application of the testator's bounty to those objects; or whether their corporate designation be mistaken. If the intention sufficiently appears in the bequest, it would be valid." In the latter case certain bequests given by the will of Mrs. Zane to the Yearly Meeting of Friends in Philadelphia, an unincorporated association, for purposes of general and indefinite charity, were, as well as other bequests of a kindred nature, held to be good and valid; and were enforced accordingly. The case then, according to our judgment, is completely closed in by the principles and authorities already mentioned, and is that of a valid charity in Pennsylvania, unless it is rendered void by the remaining objection which has been taken to it.

This objection is that the foundation of the college upon the principles and exclusions prescribed by the testator, is derogatory and hostile to the Christian religion, and so is void, as being against the common law and public policy of Pennsylvania; and this for two reasons: First, because of the exclusion of all ecclesiastics, missionaries, and ministers of any sect from holding or exercising any station or duty in the college, or even visiting the same: and Secondly, because it limits the instruction to be given to the scholars to pure morality, and general benevolence, and a love of truth, sobriety, and industry, thereby excluding, by implication, all instruction in the Christian religion.

In considering this objection, the court are not at liberty to travel out of the record in order to ascertain what were the private religious opinions of the testator, (of which indeed we can know nothing,) nor to consider whether the scheme of education by him prescribed, is such as we ourselves should approve, or as is best adapted to accomplish the great aims and ends of education. Nor are we at liberty to look at general considerations of the supposed public interests and policy of Pennsylvania upon this subject, beyond what its constitution and laws and judicial decisions make known to us. The question, what

is the public policy of a state, and what is contrary to it, if inquired into beyond these limits, will be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of judicial duty and functions, and upon which men may and will complexionally differ; above all, when that topic is connected with religious polity, in a country composed of such a variety of religious sects as our country, it is impossible not to feel that it would be attended with almost insuperable difficulties, and involve differences of opinion almost endless in their variety. We disclaim any right to enter upon such examinations, beyond what the state constitutions, and laws, and decisions necessarily bring before us.

It is also said, and truly, that the Christian religion is a part of the common law of Pennsylvania. But this proposition is to be received with its appropriate qualifications, and in connection with the bill of rights of that state, as found in its constitution of government. The constitution of 1790, (and the like provision will, in substance, be found in the constitution of 1776, and in the existing constitution of 1838,) expressly declares, "That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall ever be given by law to any religious establishments or modes of worship." Language more comprehensive for the complete protection of every variety of religious opinion could scarcely be used; and it must have been intended to extend equally to all sects, whether they believed in Christianity or not, and whether they were Jews or infidels. So that we are compelled to admit that although Christianity be a part of the common law of the state, yet it is so in this qualified sense, that its divine origin and truth are admitted, and therefore it is not to be maliciously and openly reviled and blasphemed against, to the annoyance of believers or the injury of the public. Such was the doctrine of the Supreme Court of Pennsylvania in Updegraff v. The Commonwealth, 11 Serg. and Rawle, 394.

It is unnecessary for us, however, to consider what would be the legal effect of a devise in Pennsylvania for the establishment of a school or college, for the propagation of Judaism, or Deism, or any other form of infidelity. Such a case is not to be presumed to exist in a Christian country; and therefore it must be made out by clear

Vidal et al. *v.* Girard's Executors.

and indisputable proof. Remote inferences, or possible results, or speculative tendencies, are not to be drawn or adopted for such purposes. There must be plain, positive, and express provisions, demonstrating not only that Christianity is not to be taught; but that it is to be impugned or repudiated.

Now, in the present case, there is no pretence to say that any such positive or express provisions exist, or are even shadowed forth in the will. The testator does not say that Christianity shall not be taught in the college. But only that no ecclesiastic of any sect shall hold or exercise any station or duty in the college. Suppose, instead of this, he had said that no person but a layman shall be an instructor or officer or visitor in the college, what legal objection could have been made to such a restriction? And yet the actual prohibition is in effect the same in substance. But it is asked; why are ecclesiastics excluded, if it is not because they are the stated and appropriate preachers of Christianity? The answer may be given in the very words of the testator. "In making this restriction," says he, "I do not mean to cast any reflection upon any sect or person whatsoever. But as there is such a multitude of sects and such a diversity of opinion amongst them, I desire to keep the tender minds of the orphans, who are to derive advantage from this bequest, free from the excitement which clashing doctrines and sectarian controversy are so apt to produce." Here, then, we have the reason given; and the question is not, whether it is satisfactory to us or not; nor whether the history of religion does or does not justify such a sweeping statement; but the question is, whether the exclusion be not such as the testator had a right, consistently with the laws of Pennsylvania, to maintain, upon his own notions of religious instruction. Suppose the testator had excluded all religious instructors but Catholics, or Quakers, or Swedenborgians; or, to put a stronger case, he had excluded all religious instructors but Jews, would the bequest have been void on that account? Suppose he had excluded all lawyers, or all physicians, or all merchants from being instructors or visitors, would the prohibition have been fatal to the bequest? The truth is, that in cases of this sort, it is extremely difficult to draw any just and satisfactory line of distinction in a free country as to the qualifications or disqualifications which may be insisted upon by the donor of a charity as to those who shall administer or partake of his bounty.

But the objection itself assumes the proposition that Christianity

is not to be taught, because ecclesiastics are not to be instructors or officers. But this is by no means a necessary or legitimate inference from the premises. Why may not laymen instruct in the general principles of Christianity as well as ecclesiastics. There is no restriction as to the religious opinions of the instructors and officers. They may be, and doubtless, under the auspices of the city government, they will always be, men, not only distinguished for learning and talent, but for piety and elevated virtue, and holy lives and characters. And we cannot overlook the blessings, which such men by their conduct, as well as their instructions, may, nay must impart to their youthful pupils. Why may not the Bible, and especially the New Testament, without note or comment, be read and taught as a divine revelation in the college—its general precepts expounded, its evidences explained, and its glorious principles of morality inculcated? What is there to prevent a work, not sectarian, upon the general evidences of Christianity, from being read and taught in the college by lay-teachers? Certainly there is nothing in the will, that proscribes such studies. Above all, the testator positively enjoins, "that all the instructors and teachers in the college shall take pains to instil into the minds of the scholars the purest principles of morality, so that on their entrance into active life they may from inclination and habit evince benevolence towards their fellow-creatures, and a love of truth, sobriety, and industry, adopting at the same time such religious tenets as their matured reason may enable them to prefer." Now, it may well be asked, what is there in all this, which is positively enjoined, inconsistent with the spirit or truths of Christianity? Are not these truths all taught by Christianity, although it teaches much more? Where can the purest principles of morality be learned so clearly or so perfectly as from the New Testament? Where are benevolence, the love of truth, sobriety, and industry, so powerfully and irresistibly inculcated as in the sacred volume? The testator has not said how these great principles are to be taught, or by whom, except it be by laymen, nor what books are to be used to explain or enforce them. All that we can gather from his language is, that he desired to exclude sectarians and sectarianism from the college, leaving the instructors and officers free to teach the purest morality, the love of truth, sobriety, and industry, by all appropriate means; and of course including the best, the surest, and the most impressive. The objection, then, in this view, goes to this,—either that the testator has totally omitted to provide for religious instruction in his

scheme of education, (which, from what has been already said, is an inadmissible interpretation,) or that it includes but partial and imperfect instruction in those truths. In either view can it be truly said that it contravenes the known law of Pennsylvania upon the subject of charities, or is not allowable under the article of the bill of rights already cited? Is an omission to provide for instruction in Christianity in any scheme of school or college education a fatal defect, which avoids it according to the law of Pennsylvania? If the instruction provided for is incomplete and imperfect, is it equally fatal? These questions are propounded, because we are not aware that any thing exists in the constitution or laws of Pennsylvania, or the judicial decisions of its tribunals, which would justify us in pronouncing that such defects would be so fatal. Let us take the case of a charitable donation to teach poor orphans reading, writing, arithmetic, geography, and navigation, and excluding all other studies and instruction; would the donation be void, as a charity in Pennsylvania, as being deemed derogatory to Christianity? Hitherto it has been supposed, that a charity for the instruction of the poor might be good and valid in England even if it did not go beyond the establishment of a grammar-school. And in America, it has been thought, in the absence of any express legal prohibitions, that the donor might select the studies, as well as the classes of persons, who were to receive his bounty without being compellable to make religious instruction a necessary part of those studies. It has hitherto been thought sufficient, if he does not require any thing to be taught inconsistent with Christianity.

Looking to the objection therefore in a mere juridical view, which is the only one in which we are at liberty to consider it, we are satisfied that there is nothing in the devise establishing the college, or in the regulations and restrictions contained therein, which are inconsistent with the Christian religion, or are opposed to any known policy of the state of Pennsylvania.

This view of the whole matter renders it unnecessary for us to examine the other and remaining question, to whom, if the devise were void, the property would belong, whether it would fall into the residue of the estate devised to the city, or become a resulting trust for the heirs at law.

Upon the whole, it is the unanimous opinion of the court, that the decree of the Circuit Court of Pennsylvania dismissing the bill, ought to be affirmed, and it is accordingly affirmed with costs.

Vol. II.—26

ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Pennsylvania, and was argued by counsel. On consideration whereof, It is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court, in this cause be, and the same is hereby affirmed with costs.